McCOOK COUNTY NATIONAL BANK, a corporation, Appellant,

v.

Bruce COMPTON and D. W. Godfrey, Appellees.

No. 76–1785.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1977.

Decided June 17, 1977.

E. Steeves Smith (argued), Tinan, Carlson, Padrnos & Smith, Mitchell, S. D., on brief, for appellant.

Vance Goldammer, Sioux Falls, S. D., argued, for appellees; Robert J. McDowell, Sioux Falls, S. D., on brief.

Before VAN OOSTERHOUT, Senior Circuit Judge, and BRIGHT and ROSS, Circuit Judges.

ROSS, Circuit Judge.

This appeal arises from a civil action brought by the appellant, McCook County National Bank (McCook) to recover the amount of a check drawn on the account of appellee Compton, signed by appellee Godfrey, and cashed by McCook; but on which check Compton and Godfrey subsequently stopped payment. The district court found that McCook was not a holder in due course and hence not entitled to recovery. For the reasons stated below, we reverse.

The check in question, drawn on the Northwestern National Bank of Sioux City, Iowa (Northwestern), for $13,340.00, was payable to Dean Tabke as payment for a cattle feeding contract between Tabke and Compton. The Tabke cattle feeding operation was financed by the United National Bank of Sioux Falls, South Dakota (United) which held perfected security interests in virtually all the property owned by Tabke. Financing statements were filed with the McCook County Register of Deeds to cover the property on September 6, 1973, September 15, 1973, and on May 9, 1974. Those security agreements were reported in the credit reporting service published by the Register of Deeds immediately following each filing. McCook bank subscribed to this service and Mr. Eichinger, the McCook bank officer involved in this transaction, was familiar with the service though he had no recollection of this specific report relating to Tabke.

After a particularly bad year for Tabke's business, a United bank officer, Kepplinger, met with Tabke on Thursday, January 30, 1975, to review his financial condition. United obtained at this time a complete list of Tabke's accounts receivable and decided to call in Tabke's loan. Tabke was instructed by Kepplinger to collect his accounts receivable and to turn any proceeds over to United and not to pay any general creditors. On Sunday, February 2, 1975, Tabke met with Godfrey, Compton's employee, and obtained a check for Tabke's contract with Compton. Inadvertently the check imprinter entered the amount $3,430.00 on the check though the handwritten portion stated $13,430.00. The check indicated that it was in full payment of feeding contract. Monday, February 3, 1975, Tabke endorsed the check "Dean Tabke, Beef Lodge" and instructed his wife to cash the check at McCook bank and obtain money orders made out to six creditors. The Tabkes did not have an account at McCook bank but had done business with the McCook bank in the past.

Due to the discrepancy in the amounts inscribed on the check, Mrs. Tabke mentioned this problem to the McCook bank officer, Eichinger, when she went to the bank that morning to cash the check. Eichinger contacted Northwestern bank to verify the amount of the check and to ascertain whether sufficient funds existed to cover the check. Northwestern contacted Godfrey who acknowledged the error and said it was "okay to cash it." Northwestern then informed Eichinger that the check was "okay." Eichinger then approved the check and authorized the teller to cash it and issue the six money orders.

Before Mrs. Tabke left the bank she spoke with Eichinger again. The district court found the gist of Mrs. Tabke's remarks at that time to be that she had brought the check to the McCook bank be-cause her husband wanted the six creditors to be paid and the United bank, where they normally did business, might "grab it [the check]." Mrs. Tabke then left the bank. The money orders were distributed to the creditors.

Kepplinger, from United bank, spoke with the Tabkes on February 3, 1975, and discovered that Tabke had paid other creditors with the proceeds of Compton's account. Kepplinger contacted Compton and explained United bank's interest in the Tabke accounts receivable. Though not directly asked by United bank to stop payment on the check, Compton did so nevertheless. United bank has defended this suit on behalf of Compton and Godfrey.[1]

## HOLDER IN DUE COURSE STATUS.

The issue before this court is whether McCook bank became a holder in due course of the Compton check when Mrs. Tabke cashed it.[2] The pertinent South Dakota commercial statutes are as follows:

S.D.C.L. 57–12–2 (1967)

A holder in due course is a holder who takes the instrument

(1) For value; and

(2) In good faith; and

(3) Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

S.D.C.L. 57–1–7 (1967)

In this title, unless the context otherwise requires, a person has "notice" of a fact when

(1) He has actual knowledge of it; or

(2) He has received a notice or notification of it; or

(3) From all the facts and circumstances known to him at the time in question he has reason to know it exists.

---

1. McCook bank asserts that Compton and Godfrey are precluded from raising the claims of a third party to the instrument, namely, United bank. In light of our disposition of this case, we need not reach this issue.

2. Compton and Godfrey do not contend that McCook bank did not take the instrument for value. Accordingly that provision is not discussed.

A person "knows" or has "knowledge" of a fact when he has actual knowledge of it. * * * *The time and circumstances under which a notice or notification may cease to be effective are not determined by this title.* (Emphasis supplied.)

*NOTICE.*

In the district court's analysis of the transaction, the crucial factor was notice by means of the Register of Deeds reporting service. The district court found that McCook bank subscribed to that service and under S.D.C.L. 57–1–9 (1967) notice to an organization is effective "from the time when it would have been brought to his [the person conducting the transaction] attention if the organization had exercised due diligence." In addition, the district court found that Eichinger was personally familiar with both the service and the fact that "the check obviously represented a payment on account with Tabke." These factors led the district court to believe that McCook bank had reason to know of the secured creditor's claim and thus denied McCook bank status as a holder in due course, relying on *Morgan Guaranty Trust Co. of New York v. Third National Bank of Hampden County,* 400 F.Supp. 383 (D.Mass.1975). We disagree with the analysis of the district court for the following reasons.

In *Morgan,* Treasury Bills, stolen from Morgan Guaranty Trust Company (Morgan), were pledged to Third National Bank as security for loans. Morgan attempted to recover from Third National for the alleged conversion of those bills. Immediately after the bills were stolen, Morgan sent notices of the lost securities to bankers and brokers throughout the country including the Third National Bank. The court held that the receipt by Third National of the lost securities notice from Morgan and the fact that the exercise of due diligence would have brought the specific notice to the attention of bank personnel who handled such negotiable instruments placed Third National on notice and destroyed their status as holders in due course.

Such facts are not present in this case however. United bank did not give a specific notice to McCook bank of their security interest in Tabke's accounts receivable. Inclusion of Tabke's agreement in summary form in the general report in the Register of Deeds commercial reporting service is not the same as a *specific notice* sent *directly* to a bank from a secured party. Reliance on *Morgan* to support the effectiveness of notice under this factual situation is misplaced.

■ The question must be whether the reporting service involved here provided notice. This court declines to make any broad judgment concerning the effectiveness of notices in newspapers or reporting services: it is clear that under some circumstances, one would be hard-pressed to deny that an individual might have received notice from a newspaper account or report. However, in this case, the publication was a biweekly listing of security agreements that were filed with the Register of Deeds. The listings appeared only once and covered only summaries of the *filings* of security agreements and made no mention of the disposition of those agreements at any later point in time. In addition, the three Tabke transactions appeared in the reporting service on September 15, 1973, September 30, 1973, and May 15, 1974, with the first and the last transactions covering proceeds from the secured collateral. These reports appeared, respectively, seventeen months, sixteen months and nine months prior to the time Tabke cashed Compton's check at McCook bank in February 1975. Assuming, *arguendo,* that subscribing to and receiving the reporting service was sufficient notice, it is questionable whether such notice remains effective. S.D.C.L. 57–1–7 (1967), *supra,* states that "[t]he time and circumstances under which a notice or notification may cease to be effective are not determined by this title." However, implicit in the inclusion of such a proviso in the statute is the logical inference that notice might cease to be effective after some period of time, an assertion embodied in the doctrine of "notice forgotten in good faith."

*Graham v. White-Phillips Co.,* 296 U.S. 27, 56 S.Ct. 21, 80 L.Ed. 20 (1935) is the controlling case for this theory. *Graham* concerned a factual pattern quite similar to *Morgan Guaranty Trust Co., supra,* where notices that specific securities had been stolen were sent to area banks and brokers. The Court noted that "negotiable instrument law must be interpreted in view of the intended end—here, the free circulation of negotiable paper \* \* \*." 296 U.S. at 31, 56 S.Ct. at 23. In light of that, the Court quoted from *Lord v. Wilkinson,* 56 Barb. (N.Y.) 593 (1870):

> But if the *bona fides* of the defendants must be judged of from their acts, purposes and knowledge as they existed upon the day of the purchase, then the notice served is only *prima facie* or presumptive evidence of *mala fides,* and may be rebutted by proof that the notice was lost, or its existence and contents forgotten.

296 U.S. at 32, 56 S.Ct. at 23.

That this doctrine is still vital is evidenced by the commentary to the corresponding Uniform Commercial Code provision § 1–201(25) which states that by leaving open the time or circumstances under which notice or notification ceased to be effective, cases such as *Graham v. White-Phillips Co., supra,* are not overruled.

Indeed, in the First Circuit's disposition of *Morgan Guaranty Trust Company of New York v. Third National Bank of Hampden County,* 529 F.2d 1141 (1st Cir. 1976) this same issue was raised, but in the context of a specific notice received by the bank just *three* months prior to the negotiation of a very unusual security. The court stated however that:

> It is most likely that a notice will be deemed ineffective only because so much time has passed that the exercise of due diligence would not have brought the notice to the attention of the individual conducting the transaction.

529 F.2d at 1144.

In light of the nature of the incomplete factual description by the reporting service itself and the time sequence involved in this case, we cannot agree that merely because the bank subscribed to the service they were on notice of the particular transaction reported therein, and to the extent that the district court so found we hold that factual finding to be clearly erroneous.[3]

Compton and Godfrey also assert that McCook bank had notice of an irregularity or defense to the instrument from the instrument itself, pointing out four irregularities: first, the check was drawn on a farm account, payable to Dean Tabke, Beef Lodge and obviously, therefore, a business check; second, the endorsement "In Final Settlement of Feeding Contract" also indicated that it was a business account; third, there was a $10,000 discrepancy on the face of it; and fourth, the check was presented already endorsed.

■ In regard to the fact that the check was already endorsed, we find this to be of no importance: it would not be so unusual for a spouse to handle such a transaction and in addition, McCook bank was familiar with both Dean Tabke and Mrs. Tabke. In regard to the $10,000 discrepancy, as will be discussed below, McCook bank prudently verified the correct amount before proceeding. We need only consider the assertion that the check was obviously a business check.

■ The endorsement here was not a restrictive endorsement nor was it endorsed by anyone other than the payee. Indeed, this check was endorsed by the payee and was fully negotiable on its face. Compton and Godfrey argue that the fact that the check appeared to be a fully negotiable *business* check was sufficient to alert McCook bank that this check represented

---

**3.** Eichinger testified that at the time the check was cashed neither he nor any other representative of the McCook bank had any knowledge of the assignment of the account to United bank. No testimony was received to the contrary. Nothing in the record establishes that at the time of cashing the check, Eichinger remembered seeing the Tabke transactions in the commercial credit reports some nine to seventeen months earlier. To infer notice or bad faith under these circumstances, based on the earlier credit reports, is not tenable.

secured proceeds and in addition, that Tabke had no right to disburse such proceeds to his creditors. We do not agree.

This is not a case of patent irregularity on the face of the instrument. For instance, in *First National Bank of Linton v. Otto Huber and Sons, Inc.,* 394 F.Supp. 1284, 1287 (D.S.D.1975) a note was improperly executed leaving the due date of the note unclear. The court considered this irregularity sufficient to destroy holder in due course status. However in *Eldon's Super Fresh Stores, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 296 Minn. 130, 207 N.W.2d 282 (1973) an attorney used a check of a corporate client to buy stock for his personal account. Even though it was drawn on a corporate account, made payable to Merrill Lynch and signed by the corporate president, when it was negotiated by the corporate attorney for a personal stock purchase, the court found that Merrill Lynch had no notice and was still a holder in due course. The court did not require Merrill Lynch to impute bad faith to the attorney who negotiated the check which is what Compton and Godfrey urge this court to do. We fail to find any notice from the instrument or duty to inquire further, especially in view of our determination that the information in the reporting service nine to seventeen months earlier was insufficient to constitute the required notice. *See* Footnote 3, *supra.*

█ Compton and Godfrey finally assert that McCook bank had "notice" from the conversations at the bank between Eichinger and Mrs. Tabke on February 3, 1975. The district court found that after the check had been cashed, Mrs. Tabke again spoke with Mr. Eichinger and "made some remark to the effect that she had brought the check to plaintiff bank because her husband wanted six of his creditors to be paid and had they taken the check to the bank where they normally did business, United National Bank in Canistota, that bank would 'grab it.'" Though the testimony concerning this conversation is quite ambiguous, it is quite clear that this conversation occurred *after* the check had been cashed

and is, in this court's opinion, irrelevant to the issue of notice. S.D.C.L. 57–12–15 (1967) states:

> To be effective notice must be received at such time and in such manner as to give a reasonable opportunity to act on it.

It seems logically impossible for a conversation which takes place *after* a check is cashed to provide effective notice of reasons why the check should not be cashed, thus enabling the bank to act on that knowledge.

*Third National Bank In Nashville v. Hardi-Gardens Supply of Illinois, Inc.,* 380 F.Supp. 930, 941 (M.D.Tenn.1974) stated that notice meant "notice at the time of the taking, the time of the negotiation of the note * * *." Similarly, in *Manufacturers & Traders Trust Co. v. Murphy,* 369 F.Supp. 11, 13 (W.D.Pa.1974) the maker of a check stopped payment on the check after it had already been negotiated for value at a second bank. The court found that the second bank became a holder in due course at the moment of negotiation and that later events made no difference in regard to its status. *See also Sullivan v. United Dealers Corp.,* 486 S.W.2d 699, 701 (Ky.1972). We find that the conversation between Eichinger and Mrs. Tabke subsequent to cashing the check provided no timely notice to McCook bank of any claims or defenses on the check.

### GOOD FAITH.

█ In addition to the requirement that the instrument be taken without notice, S.D.C.L. 57–12–2(2) (1967) requires that the instrument be taken "[i]n good faith." Good faith is defined by S.D.C.L. 57–1–2(19) (1967) as "honesty in fact in the conduct or transaction concerned." *Central Bank & Trust Co. v. First Northwest Bank,* 332 F.Supp. 1166, 1169 (E.D.Mo.1971) discussed the applicable standard:

> In determining whether the item was taken in "good faith" more than mere suspicion must be present; there must be actual knowledge of some defect in the instrument. (Citations omitted.)

The district court declined to determine this issue but since it is a statutory requirement

to show that a person claiming to be a holder in due course acted in good faith, this court must examine the record and judge the transaction not from hindsight but on the basis of the facts known to McCook bank at the time Compton's check was negotiated. We feel the record is clear that McCook bank had no actual or constructive knowledge that the check represented secured proceeds at the time it was presented. As stated in *Third National Bank In Nashville v. Hardi-Gardens Supply of Illinois, Inc., supra,* at 941, "[t]he fact that the Bank might have exercised better credit judgment with respect to the collateral is of no occasion." *See McConnico v. Third National Bank In Nashville,* 499 S.W.2d 874, 882 (Tenn.1973). *See* Footnote 3, *supra.*

■ McCook bank was presented with a check that had an obvious $10,000 discrepancy on its face. As any prudent bank would, McCook contacted the Northwestern bank to ascertain the correct amount and whether adequate funds existed to cover the check. Assured by the bank and indirectly by Compton, who issued the check, that the check was "okay", McCook proceeded to cash the check and issue money orders. There were no remaining irregularities in the instrument itself. Since this court has found no actual notice and insufficient constructive notice from the reporting service, and no other notice at the time the check was cashed, we can find no bad faith or dishonesty on the part of McCook bank in cashing the check.

In sum, while a better judgment concerning the negotiability of the check *might* have been made we can not find the requisite notice or bad faith that would deprive McCook bank of its status as holder in due course. Accordingly, the judgment of the district court is reversed and the case remanded for disposition not inconsistent with this opinion.