CORN EXCHANGE BANK,
Plaintiff and Appellee,

v.

TRI–STATE LIVESTOCK AUCTION CO., INC., Defendant and Appellant,

and

Elkton Livestock, Inc.; Sirloin, Inc.; and David Mulso, Defendants.

Nos. 14366, 14441 and 14443.

Supreme Court of South Dakota.

Argued Sept. 12, 1984.

Decided May 22, 1985.

Michael F. Pieplow of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for plaintiff and appellee.

George A. Bangs of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendant and appellant.

KONENKAMP, Circuit Judge.

This appeal arises from a civil action brought by appellee, Corn Exchange Bank (Bank), to recover the amount of three checks drawn on the account of appellant, Tri-State Livestock Auction Co., Inc. (Tri-State). Bank claimed that it was a holder in due course of the checks. After a four day trial, the jury returned a verdict in favor of Bank.

The checks in question, drawn on the Northwestern State Bank of Orange City, Iowa (Northwestern) and totaling $1.2 million, were payable to Elkton Livestock, Inc. (Elkton) as payment for the purchase of cattle by Tri-State. Tri-State had entered into an arrangement with Elkton in which Tri-State would pay advances to Elkton for cattle to be delivered to Tri-State for sale at auction. To facilitate this endeavor, Tri-State's owner gave Elkton's purchasing agent and his wife a checkbook with authority to write these advances on Tri-

State's account and deposit them to Elkton's account at Bank to cover its purchases of livestock to be delivered to Tri-State by auction day. After each auction, Tri-State would pay Elkton the remainder of the agreed upon sale price which fluctuated depending upon the price the livestock brought.

Over a short period of time 17 checks were written without incident, totaling five million dollars. The arrangement worked well until Tri-State's bankers began to put pressure on the owner, Mr. Den Herder, to discontinue the practice of paying advances—which it borrowed—on livestock not yet delivered to Tri-State. The deal finally collapsed when Elkton arranged for the purchase and delivery of more cattle than Tri-State anticipated that it could sell.

Fearing that the advance checks being written by Elkton's purchasing agent on Tri-State's account were far in excess of what the agent needed to buy the usual amount of cattle, Den Herder notified his bank, Northwestern, that the three checks in question were not to be honored. However, these checks had already been deposited in and honored by the Bank, and when it was notified by Northwestern that they would not be honored by Tri-State, the Bank had by that time paid out $1,012,-850.59.

At the trial, there were a number of factual disputes surrounding the relationship between the owners and agents of Elkton and the Bank and concerning whether or not the Bank had earlier notice of dishonor than it claimed, all of which, it was argued, bore on the question of whether Corn Exchange Bank was a good faith holder in due course. Except as otherwise stated herein, we deem these matters to have been resolved by the jury's verdict. The issues that remain for our consideration relate to the trial court's discovery rulings and the legal sufficiency of the instructions.

Tri-State first argues that the trial court erred in denying it discovery of the financial arrangements between the Bank and two of the defendants, which may have led to the disclosure of a secret settlement agreement between these parties. We agree.

Pursuant to an alleged agreement, the terms of which were not disclosed to the court or opposing counsel, the Bank—by amending its Complaint—dismissed its claims against the owner of Elkton, Wesley Van Dyke. According to Tri-State's appellate lawyers, proof of this agreement exists in written form which they uncovered after the trial during administrative proceedings unrelated to this action. The Bank's counsel does not deny that there was an agreement, but insists that it was a common redemption agreement between the Bank and its debtor (Van Dyke) negotiated at arm's length and dealing with matters separate from this litigation.

Prior to and during the trial, counsel for Tri-State moved to force the disclosure of the financial arrangements between the Bank, Elkton and Van Dyke. The Bank resisted these requests. In denying disclosure, the trial court reasoned that the requested information was irrelevant, since such arrangements would have taken place after the dishonored checks were negotiated. However, the lawyers for the Bank, Elkton and Van Dyke did not tell the trial judge that there was a written settlement agreement between them. Tri-State argues that the alleged agreement would have been exposed if this motion had been granted.

When it was uncovered five months after the trial, Tri-State's counsel moved to supplement the record with the agreement. The trial court denied the motion and we upheld this decision. Hence, the agreement itself and even the fact of its existence are not properly before us at this time. However, because the question of whether there was a clandestine settlement between some of the litigants is important to the fair resolution of this case, we will assume for the sake of argument, subject to the circuit court's review on remand, that some agreement occurred between the Bank and Van Dyke which resulted in the dismissal of the claims against him. The

question then becomes, should agreements between some, but not all, litigants be disclosed to the court and the non-agreeing parties, upon proper request by a non-agreeing party? We hold that they should.

It is noted that although Van Dyke personally was no longer in the suit, the Bank called him as an "adverse" witness and he remained in the courtroom as the representative of Elkton. Inexplicably, Elkton, although it was insolvent, remained in the case to ostensibly defend itself. Van Dyke's testimony did not contradict the Bank's position and in closing argument Elkton's counsel, who also represented Van Dyke, conceded that the Bank had made its case against both his client and Tri-State. We will not speculate whether such concession was the result of an agreement. The significance, if any, of these matters will be left to the trial judge's determination on remand.

Tri-State asserts that the settlement between the Bank and Van Dyke was a "Mary Carter" or "Gallagher" agreement. Agreements such as these derive their names from the cases of *Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla.App. 1967), and *City of Tucson v. Gallagher*, 108 Ariz. 140, 493 P.2d 1197 (1972). Although these agreements vary considerably depending on the factual circumstances, three features are found in all of them: (1) The agreeing defendant remains a party and continues his defense of the suit. However, his liability is limited by the agreement with the liability sometimes decreasing when the liability of the non-agreeing parties increases. (2) The agreement is secret. (3) The agreeing defendant guarantees that the plaintiff will receive a certain amount, even if a verdict is not rendered against the defendant or the verdict is less than the amount specified in the agreement. *See General Motors Corp. v. Lahocki*, 286 Md. 714, 410 A.2d 1039 (1980), and the citations therein. It is the secrecy of these agreements that is most often condemned. *See, e.g., Daniel v. Penrod Drilling Co.*, 393 F.Supp. 1056 (E.D.La. 1975). A number of courts have held that these agreements are discoverable and a

trial court's failure to require disclosure and subsequent admission into evidence can be prejudicial error. *Cox v. Kelsey-Hayes Co.*, 594 P.2d 354 (Okla.1978); *Mustang Equipment, Inc. v. Welch*, 115 Ariz. 206, 564 P.2d 895 (1977); and *Kuhns v. Fenton*, 288 So.2d 253 (Fla.1973). The reason for requiring disclosure of such agreements is clear:

> The search for the truth, in order to give justice to the litigants, is the primary duty of the courts. Secret agreements between plaintiffs and one or more of several multiple defendants can tend to mislead judges and juries, and border on collusion.

*Ward v. Ochoa*, 284 So.2d 385, 387 (Fla. 1973).

Although we have not had occasion to deal with the question of discovery of settlement agreements, we have previously held that under certain circumstances the jury should be made aware of settlements between some of the parties. *Degen v. Bayman*, 86 S.D. 598, 200 N.W.2d 134 (1972). Otherwise, the jury "[n]ot knowing the motive for the evaporation of adversary vigor" between some of the litigants may become misled or confused. *Degen*, 86 S.D. at 608, 200 N.W.2d at 139. A party's financial interest in litigation, derived from an agreement with some of the other litigants, is a proper subject for cross-examination and proof. *Cox* at 358; *General Motors Corp. v. Simmons*, 558 S.W.2d 855 (Tex.1977).

But without prior disclosure the trial court never arrives at the question of whether the agreement should be revealed to the jury. It is obvious, therefore, that discovery of such agreements is imperative. Furthermore, it cannot be left to counsel for one of the agreeing parties to determine if an agreement is the kind that should be given to the jury and thus is discoverable. Any agreement between some, but not all, of the litigants should be disclosed upon the request of any party in accordance with our rules of procedure, whether or not the agreement is a "Mary

Carter" agreement. Then, if requested, the trial court can determine if the agreement should be made known to the jury.

In determining whether the jury should know of the agreement, the following criteria should be used. If an agreeing defendant stands to gain financially from a plaintiff's verdict or if the agreeing defendant's maximum liability will be reduced by increasing the liability of his co-defendant, the jury must be informed of the contents of the agreement. *See Cox* at 359.

In view of what we have stated here, we hold that the agreement, if any, between the Bank and Van Dyke, should have been disclosed to opposing counsel and the court. Accordingly, this case is remanded to the circuit court to determine, first, if there was in fact an agreement between the aforementioned parties, and if so, whether such agreement should have been disclosed to the jury in accordance with the criteria outlined above. If there was, in fact, an agreement and it should have been made known to the jury, then the trial court shall determine if the failure of the jury to see the agreement was prejudicial to Tri-State. If it was prejudicial then a new trial shall be granted. However, the case is affirmed if the alleged agreement was not required to be shown to the jury or if the failure to show it to the jury was not prejudicial.

Tri-State next assigns as error the trial court's failure to instruct the jury that the Bank could not be "intentionally ignorant" and remain a good faith holder in due course. Tri-State contends that the Bank knew Elkton was in financial difficulty at the time that Bank accepted the checks, but chose to ignore this reality, because of Elkton's heavy indebtedness to it, in order to avail itself of Tri-State's healthy subsidies in the form of advances. Tri-State insists that given what the Bank already knew about Elkton, it should have more closely examined the transaction surrounding the three checks in question. Therefore, Tri-State argues that the trial court should have given its requested instruction on "intentional ignorance."

If a party fails to make an inquiry for the purpose of remaining ignorant of facts which he believes would disclose a defect in the transaction, he may be found to have acted in bad faith. *Funding Consultants, Inc. v. Aetna Casualty & Surety Co.*, 187 Conn. 637, 447 A.2d 1163 (1982); *Hollywood Nat'l Bank v. IBM Corp.*, 38 Cal.App.3d 607, 113 Cal.Rptr. 494 (1974). Certainly, the Bank was intimately acquainted with Elkton's precarious financial situation, as well as with its arrangements with Tri-State, but the question is whether such knowledge of the payee's condition is truly relevant to the issue of good faith.

In commercial transactions, the term "good faith" is defined as "honesty in fact in the conduct or transaction concerned." SDCL 57A–1–201(19). Construing South Dakota law, the Eighth Circuit Court of Appeals discussed the applicable standard: " 'In determining whether the item was taken in "good faith" more than mere suspicion must be present; there must be actual knowledge of some defect in the instrument.' " *McCook County Nat'l Bank v. Compton*, 558 F.2d 871, 876 (8th Cir.1977), *quoting Central Bank & Trust Co. v. First Northwest Bank*, 332 F.Supp. 1166, 1169 (E.D.Mo.1971). With this limited focus, i.e. "the conduct or transaction concerned" and "actual knowledge of some defect in the instrument," knowledge of the condition of the payee/depositor Elkton is not pertinent to the question of good faith. It is the impaired nature of the drawer's situation or his instrument that the holder must have some foreknowledge of in order to establish bad faith. *Commerce Bank of University City v. EDCO Financial Services*, 379 F.Supp. 293 (E.D.Mo.1974), *aff'd* 503 F.2d 1047 (8th Cir.1975); *Bowling Green, Inc. v. State Street Bank & Trust Co.*, 425 F.2d 81 (1st Cir.1970).

The record does not disclose any instance where it could be inferred that the Bank chose to remain intentionally ignorant of facts which could give rise to knowledge of a defect in the instrument or

the transaction. The trial court is not obliged to give an instruction if there is insufficient evidence to support it, even if the proffered instruction is a correct statement of law. *Black v. Gardner,* 320 N.W.2d 153 (S.D.1982); *Atyeo v. Paulsen,* 319 N.W.2d 164 (S.D.1982).

Significantly, Tri-State sought to prove that the Bank had actual knowledge of dishonor through direct communication with Tri-State's bank, Northwestern. This issue was resolved by the jury when it weighed the credibility of two bankers and found in favor of the Bank.

■■■ After carefully reviewing the record and the instructions, we are satisfied that the circuit court properly instructed the jury in accordance with the principles set forth above, and within the context of the facts adduced at trial.

Tri-State contends that the trial court improperly instructed the jury on the elements required to be proved by the Bank in order to establish its claim as a holder in due course. When a defense is shown to exist, a person claiming to be a holder in due course has the burden of proving that he is "in all respects" a holder in due course. SDCL 57A-3-307(3). A holder in due course is a holder who takes the instrument

....

(a) For value; and

(b) In good faith; and

(c) Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person....

SDCL 57A-3-302(1).

Tri-State complains that two of the trial court's instructions were confusing on who had the burden of establishing holder in due course status and what factors were required to constitute such status. Instruction number 10 provided in pertinent part:

In this action, the plaintiff has the burden of proving the following issues:

1. that is [sic] accepted each check in good faith and without prior notice of

dishonor, so that it is a holder in due course; and

2. the amount of damages sustained.

Instruction number 15 further elaborated plaintiff's burden as follows:

One of the issues presented in this case is whether the Corn Exchange Bank is a "holder in due course" of three checks drawn on Tri-State Livestock Auction and issued to Elkton Livestock, which deposited the checks in the Bank.

It is the law that three elements must be present for a party to be a holder in due course. The party must take the checks:

1. for value;

2. in good faith; and

3. without notice of any defense or dishonor to the check.

A holder in due course takes instruments free from all claims to it on the part of any person and free from all defenses of any party to the instrument with whom the holder has not dealt.

■■■ In yet another instruction (number 8) the trial court told the jury in relevant part that:

Defendant Tri-State claims that the bank took the checks with knowledge that they would be dishonored and thus is prevented from recovering.

Tri-State argues that this last instruction was an incomplete rendition of its defense and taken together with instructions 10 and 15 was most likely confusing to the jury on who had the burden of proof. The record discloses that Tri-State did not object to these instructions on this point. However, even if this issue had been appropriately preserved, Tri-State would have the burden of now showing on appeal that the jury might and probably would have returned a different verdict. *Dwyer v. Christensen,* 77 S.D. 381, 92 N.W.2d 199 (1958).

■■■ The jury was told to consider the instructions as a whole. Taken together, these instructions along with all the others clearly state that the plaintiff Bank had the burden of proof on the elements required to establish its claimed status as a holder in

due course. Our careful review of the record compels us to conclude that it is unlikely that the jury would have returned a different verdict had the three instructions complained of been compressed into a single, more consistent statement of law.

The remaining arguments of appellant Tri-State and the contentions of appellee Bank in its notice of review lack merit and thus require no discussion. The case is remanded with instructions as set forth above; in all other respects it is affirmed.

WOLLMAN, MORGAN and HENDERSON, JJ., and WUEST, Circuit Judge, Acting as Supreme Court Justice, concur.

KONENKAMP, Circuit Judge, sitting for FOSHEIM, C.J., disqualified.