Phillip BOHNA, Appellant,

v.

HUGHES, THORSNESS, GANTZ, POW-
ELL & BRUNDIN, and Allstate In-
surance Company, Appellees.

ALLSTATE INSURANCE COMPANY,
Cross–Appellant,

v.

Phillip BOHNA, and Hughes Thorsness,
Gantz, Powell & Brundin, Cross–
Appellees.

HUGHES, THORSNESS, GANTZ,
POWELL & BRUNDIN,
Cross–Appellant,

v.

Phillip BOHNA, and Allstate Insurance
Company, Cross–Appellees.

No. 3824.

Supreme Court of Alaska.

March 27, 1992.

Mark A. Sandberg, Sandberg & Smith, and J. Douglas Burke, Law Offices of J. Douglas Burke, Anchorage, for appellant and cross-appellee Bohna.

Ronald L. Bliss, Jean E. Kizer, Bradbury, Bliss & Riordan, Anchorage, for appellee and cross-appellant Allstate.

Stephen S. DeLisio, Staley, DeLisio, Cook & Sherry, Inc., Anchorage, for appellee and cross-appellant Hughes Thorsness.

Before RABINOWITZ, C.J., and MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

### INTRODUCTION

These appeals arise from judgments in an attorney malpractice case and a related indemnity claim. The jury returned a verdict setting damages suffered by plaintiff Phillip Bohna and assigning fault among:

1) Allstate Insurance Company (Allstate), 2) Hughes, Thorsness, Gantz, Powell & Brundin (HT), and 3) Bohna himself. The superior court entered two judgments on the verdict. The principal judgment was in favor of Bohna and against HT. The other judgment was on Allstate's cross-claim for indemnity and was in favor of HT and against Allstate.

The basis of the malpractice claim was HT's handling of Bohna's defense after Bohna was involved in an automobile collision which resulted in catastrophic injuries to the other driver. The crux of Bohna's complaint is that in order to save money for Allstate, HT pursued a strategy of making offers of judgment in excess of policy limits under Alaska Civil Rule 68 instead of settling the case within insurance policy limits. This strategy, approved by Allstate and agreed to by Bohna, caused Bohna to incur a large uninsured judgment.

Bohna sued both Allstate and HT. Before trial, Allstate settled with Bohna for $1 million. They also entered into a "loan receipt agreement" under which Allstate loaned Bohna $3 million, which would be repayable out of (and to the extent of) any recovery Bohna might obtain in his suit against HT. After the settlement, Allstate cross-claimed against HT for indemnity.

The jury returned a verdict of approximately $6 million for Bohna. Based on its interpretation of the law and the agreements between Bohna and Allstate, the trial court reduced the verdict by the $1 million settlement and part of the $3 million loan. The court also deducted 15% for Bohna's negligence and failure to mitigate damages, as found by the jury. Finally, in accord with a pretrial ruling that comparative indemnity principles do not apply in Alaska, the court entered judgment in HT's favor on Allstate's cross-claim because the jury also found Allstate partially at fault.

On appeal the parties dispute the validity of the loan receipt agreement and to what

extent—if any—it should result in a setoff. Also disputed are the alleged assignment of Bohna's malpractice claim, the propriety of the jury's consideration of the issues of Bohna's failure to mitigate damages and contributory negligence, the sufficiency of the evidence relating to an attorney's standard of care, the court's allocation of peremptory challenges, the exclusion of certain evidence, various jury instructions, and the award of costs and attorney's fees. With regard to Allstate's failed indemnity claim, the issues are whether the trial court erred by ruling that Allstate had to be found fault-free to recover, denying Allstate's motion to amend its cross-claim, and refusing to allow the jury to decide if Allstate breached its covenant of good faith and fair dealing.

For the reasons set forth below, the *Bohna* judgment is reversed and remanded with direction to enter an amended judgment in Bohna's favor. The *HT* judgment is affirmed.

## FACTS AND PROCEEDINGS

### *The Underlying Case*

In 1981 Phillip Bohna was involved in a collision which left the driver of the other car, Anthony Stevens, brain damaged and quadriplegic. During the course of the ensuing litigation, it became clear that the liability picture did not look good for Bohna.[1]

Only seventeen at the time of the accident, Bohna had no significant assets of his own. However, he was covered by his father's automobile liability insurance policy with Allstate. That policy provided for $50,000 bodily injury liability coverage plus unlimited coverage for prevailing party's attorney's fees under Alaska Civil Rule 82.

We note, in order to set the context of this case, that under Civil Rule 82 attorney's fees are awarded to the prevailing party as a matter of course. Civil Rule 82 establishes a fee schedule based on the size

---

1. Bohna admitted to having had one or two beers before the accident. There was also evidence that Bohna had been driving too fast and had run a red light just before the crash. Boh-

na's lawyer at the time thought that "the chances of [Bohna] escaping liability ... were ... pretty remote."

of the judgment and the extent to which the suit was contested before entry of judgment.[2] In cases of catastrophic injury and low bodily injury insurance limits, it is not unusual for insurance companies to be liable for more in court awarded attorney's fees than for the bodily injury limits. Thus if there is a $3 million verdict, an insurance company, with coverage such as that provided by Allstate in this case, would generally be liable to pay $50,000 for bodily injury liability coverage, plus approximately $300,000 as court awarded attorney's fee coverage.[3] E.g., Schultz v. Travelers Indem. Co., 754 P.2d 265, 266 n. 1 (Alaska 1988) (attorney's fees of approximately $359,000 awarded for the death of one passenger against an insurance company which had bodily injury limits of $100,000 per passenger); McDonough v. Lee, 420 P.2d 459, 465 n. 22 (Alaska 1966) (collectability of the entire judgment not relevant to an award of attorney's fees under Civil Rule 82); Liberty National Ins. Co. v. Eberhart, 398 P.2d 997 (Alaska 1965) (insurance company's liability for attorney's fees not limited to pro-rata share based on ratio of judgment to policy limits). The total policy limits in this example would therefore be approximately $350,000. Id.

The dispute between Bohna and Stevens ultimately came down to the question of how much was available under the policy's unlimited coverage for attorney's fees. Stevens hired attorney Ray Nesbett to represent him. Nesbett and an Allstate claims manager discussed a possible settlement, but they could not come to terms.[4] Stevens sued Bohna on August 16, 1983. Allstate retained James Powell, a partner at HT, to defend Bohna.

Powell offered Nesbett $50,000 for Stevens' bodily injury. However, Nesbett and Powell disagreed on the proper size of the Civil Rule 82 attorney's fee for which Allstate was liable under the policy. Nesbett valued the case at between $3 and $10 million and insisted that attorney's fees would be 10% of that amount under Civil Rule 82. Powell believed that the value of the case was lower and that Civil Rule 82 fees would be lower than 10% unless there was a trial.[5] Because Nesbett did not believe that Powell's offer included all money available under the Allstate policy, it was rejected.

In late 1983, Powell proposed that Bohna make offers of judgment under Civil Rule 68 that exceeded policy limits.[6] Bohna was told that he could consult with independent counsel at Allstate's expense, and that Allstate would pay Bohna's attorney's fees and costs relating to his bankruptcy proceeding if he agreed and an offer was

---

**2.** At the time Stevens sued Bohna, Civil Rule 82(a)(1) provided as follows:

> Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein:

ATTORNEY'S FEES IN AVERAGE CASES

| | Contested | Without trial | Non-contested |
|---|---|---|---|
| First $ 2,000 | 25% | 20% | 15% |
| Next $ 3,000 | 20% | 15% | 12.5% |
| Next $ 5,000 | 15% | 12.5% | 10% |
| Over $10,000 | 10% | 7.5% | 5% |

> Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court in its discretion in a reasonable amount.

**3.** The exact attorney's fees award would be $300,850, calculated by employing the "contested" column of the Civil Rule 82 schedule. See infra n. 21.

**4.** There is conflicting evidence concerning just what Allstate offered at this point. Barbara Bailey, Allstate's claims manager for Bohna's case, testified that she offered Nesbett "full policy limits." Nesbett testified that Bailey said she "would offer the Rule 82 attorneys fees calculated on the $50,000 which would be an amount somewhere between 50 and 55,000." We conclude that Allstate never made a "policy limits" offer. See infra Part D.3.

**5.** The disagreement on the correct percentage for which Allstate was liable arose because Civil Rule 82 provides three schedules by which to compute attorney's fees: contested, contested without trial, and noncontested. Nesbett insisted that Allstate's policy provided coverage for attorney's fees on the "contested" basis, while Powell maintained that basis was appropriate only if the case actually went to trial.

**6.** Civil Rule 68 provides in part that if the offer is more favorable than the offeree's final judgment then the offeree will not only be ineligible to recover his or her costs and attorney fees incurred after the offer was made, but also will be liable for such fees incurred by the offerer.

accepted. After consulting with attorney Hugh Wade, Bohna agreed to a $500,000 offer of judgment. Allstate made such an offer [7], but Nesbett rejected it. Powell next suggested increasing the offer to $1 million to put more pressure on Nesbett to settle. Powell again advised Bohna of his right to consult with independent counsel at Allstate's expense, but Bohna indicated that, if he went into bankruptcy, it did not matter by how much. Bohna, therefore, never went back to consult with Wade on excess offers of judgment. He agreed to the $1 million offer of judgment. Nesbett refused the offer. After the $1 million offer of judgment was refused, Powell filed an answer on Bohna's behalf, thus formally contesting Stevens' claim. Under the Civil Rule 82 fee schedule, this raised the awardable attorney's fees on offers of judgment.[8] Thus, offers of judgment apparently became less attractive to Allstate, and Allstate made no more offers for the next two years. Instead, normal discovery took place.

In September 1986, Nesbett offered to settle for $350,000. This offer remained open for fifteen days. On September 15, a new Civil Rule 82 schedule took effect, lowering the maximum applicable percentage for fees "without trial" from 7.5% to 2%.[9] Powell believed that the new schedule applied, and he believed that $350,000 was in excess of policy limits. Allstate did not accept Nesbett's offer. At this point Powell considered the verdict value of the case to be between $3 and $6 million, with $3 million being most likely. Powell suggested that Bohna make a $2 million offer of judgment. Allstate agreed, and Bohna signed a form authorizing up to a $3 million offer of judgment. The $2 million offer of judgment, like the others, was rejected by Nesbett.

Finally, in October 1986, Powell proposed a $3 million offer of judgment, which was agreed to by Allstate. At this point, Nesbett felt that it was possible that Stevens might obtain a less favorable judgment if he went to trial. If this were to happen, not only would Stevens be ineligible to recover his attorney's fees incurred after the offer was made, but he also would be responsible for such fees to HT.[10] Nesbett therefore accepted this offer, and on October 30, 1986, judgment was entered against Bohna (the *Stevens* judgment). With prejudgment interest, it amounted to over $4.6 million.[11]

In October 1987, Bohna began bankruptcy proceedings. Nesbett then informed Bohna's bankruptcy attorney, William Pace, that the *Stevens* judgment might not be dischargeable because alcohol was in-

7. If accepted, Allstate would not have been responsible for the face value of the offer of judgment. Rather, Allstate's liability would still be governed by its contract. Thus, Allstate would be liable for the face value of the policy, attorney's fees, and costs. Attorney's fees would be calculated as a percentage of a $500,000 judgment, probably under the non-contested column of Civil Rule 82, and thus would have amounted to no more than $25,525. *See generally supra* notes 2 & 4. The balance would be the responsibility of Bohna. Powell, Allstate, and Bohna anticipated that this would be discharged in bankruptcy.

8. Fees on offers of judgment were thereby to be calculated under the "without trial" instead of the "non-contested" column.

9. The new schedule provided:
 Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein:

ATTORNEY'S FEES IN AVERAGE CASES

| Judgment and, if awarded, Prejudgment Interest | Contested | Without trial | Non-contested |
|---|---|---|---|
| First $ 25,000 | 20% | 18% | 10% |
| Next $ 75,000 | 10% | 8% | 3% |
| Next $400,000 | 10% | 6% | 2% |
| Over $500,000 | 10% | 2% | 1% |

Should no recovery be had, attorney's fees may be fixed by the court in its discretion in a reasonable amount.

10. *See* Alaska Civil Rule 68; *Truckweld Equipment Co. v. Swenson Trucking*, 649 P.2d 234, 240 (Alaska 1982); *Miklautsch v. Dominick*, 452 P.2d 438, 440 (Alaska 1969); *see also supra* note 6.

11. This judgment initially resulted in Allstate paying a total of $167,647.53—the $50,000 face value of the policy, $116,897.53 in attorney's fees, and $750 in costs.

volved in the accident. Eventually, Bohna and Stevens reached an agreement. Bohna agreed to terminate bankruptcy proceedings and file suit against Allstate and HT. Stevens agreed not to execute on his judgment while Bohna's suit was pending.

### The Current Litigation

Bohna sued Allstate and HT claiming negligence, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing. He sought over $6 million in compensatory damages and over $12 million in punitive damages. Allstate cross-claimed against HT, seeking indemnity for any liability Allstate might have to Bohna arising out of HT's actions.

In August 1989, the trial court ruled that Allstate had breached its implied covenant of good faith and fair dealing, as a matter of law, by authorizing offers of judgment in excess of policy limits. After this ruling, Allstate and Bohna settled. The settlement included a $1 million payment by Allstate to Bohna and a "loan receipt agreement" (LRA) whereby Allstate loaned Bohna $3 million to be repaid out of any recovery Bohna might get from his suit against HT.[12] In exchange Bohna released Allstate from all liability to Bohna. In addition, Bohna agreed not to dismiss his case against HT without Allstate's written consent.[13]

A week after reaching these agreements, Allstate moved for leave to amend its cross-claim against HT to assert various direct causes of action. The trial court denied this motion, reasoning that the motion was too late and that it would preju-

dice HT by requiring additional discovery just weeks before trial. At a hearing a few days later, the court made an oral ruling that Allstate's cross-claim against HT for indemnity would be barred if Allstate were found to have any fault for Bohna's damages.

The case was tried before a jury which returned a verdict finding all three parties partially at fault for Bohna's damages. On a special verdict form, the jury allocated fault among the parties as follows: Bohna—15%, HT—34%, Allstate—51%. Bohna's damages were found to be "the value of [the *Stevens*] Judgement plus interest and costs." The jury found that Bohna failed to mitigate his damages and this failure on his part was responsible for 15% of the loss. The jury also found that punitive damages were not appropriate. As a result of the jury having found Allstate partially responsible for Bohna's damages, the trial court entered final judgment against Allstate on its cross-claim for indemnity (the *HT* judgment).

In February 1990, the trial court issued an order calculating the judgment on Bohna's claim against HT. The court began by translating the jury's verdict into the numerical figure of $6,139,544.94.[14] After deducting $1 million paid by Allstate under the settlement agreement and some $920,000 as the result of Bohna's failure to mitigate his damages (leaving some $4.2 million), the court then explained how it dealt with the $3 million paid under the LRA. Although the court's explanation is complicated, it rests on the following prem-

---

**12.** Paragraph 5 of the LRA provided that if Bohna's claims against HT are reduced by the $3 million as "consideration paid for" the release "then there shall be no obligation to repay the loan."

**13.** The $4 million was distributed roughly as follows: 60% to Stevens, 30% to the attorneys, 10% divided between Bohna and a fund to finance the litigation against HT. *See infra* Part B.7.

**14.** The trial court's calculations ran as follows:

| | | |
|---|---|---|
| $4,737,524.25 | = | Amount of <u>Stevens</u> judgment (including costs, fees and prejudgment interest). |
| − $750.00 | = | Costs paid. |
| − 50,000.00 | = | Policy face value paid. |
| − 116,897.53 | = | Attorney fees on unpaid |
| $4,569,876.72 | | judgment as of 10–30–86 (actually paid with interest January 1988). |
| +1,569,668.22 | = | 1194 days of prejudgment interest at $1,314.63 per day (10.5% per annum) from Oct. 30, 1986 to Feb. 6, 1990. |
| $6,139,544.94 | = | Verdict before deductions for jury findings re: plaintiff's failure to mitigate and for amounts received from settling joint tortfeasors. |

ise: whatever Bohna does not have to repay to Allstate from the $3 million loan is "consideration" for Bohna's release of Allstate and is thus deductible from the verdict under former AS 09.16.040(1). These deductions ultimately resulted in a final judgment against HT of $902,000.15 plus fees and costs (the *Bohna* judgment).

## DISCUSSION

### A. CALCULATION OF JUDGMENT

Since many of the contentions of the parties in this case involve the deductions which the trial court made from Bohna's judgment against HT, an explanation of those deductions is necessary.

| | | |
|---|---|---|
| $6,139,544.94 | = | Verdict before deductions. |
| −920,931.74 | = | 15% comparative fault allocated to Bohna. |
| −1,000,000.00 | = | Settlement paid Bohna by Allstate. |
| $4,218,613.20 | = | Subtotal. |
| $4,218.613.20 | | |
| ×.34 | = | Percentage of fault jury |
| $1,434,328.41 | | found belonged to HT. |
| $3,000,000.00 | = | Amount of "loan." |
| −1,434,328.41 | = | Amount of verdict that equals HT's percent of fault. |
| $1,565,671.59 | = | Amount of "loan" forgiveness received by plaintiff which is additional consideration paid by Allstate for the release. |
| $4,218.613.20 | = | Amount of verdict after undisputed setoff and plaintiff's mitigation damages are deducted. |
| −1,565,671.59 | = | Additional consideration received by plaintiff from Allstate for release. |
| $2,652,941.61 | = | Verdict, after plaintiff's claim is reduced for amounts received by him from Allstate. |
| ×.34 | = | Percentage of fault of HT. |
| $902,000.15 | = | Amount of plaintiff's uncompensated claim for which HT is responsible. |

**15.** Under current law which became effective on March 5, 1989, the court is to "enter judgment against each party liable on the basis of several liability in accordance with that party's percentage of fault." AS 09.17.080(d).

**16.** In October of 1986, AS 09.17.080(d) provided:

#### 1. *Deduction for Percentage of Fault Attributed to HT.*

■ The trial court reduced HT's liability in accordance with its percentage of fault. The trial court apparently applied the current version of AS 09.17.080(d).[15] However, the current version of AS 09.17.080 only applies to claims accruing after March 5, 1989, and should not have been applied in the present case because Bohna's claim against HT accrued on October 30, 1986, when judgment was rendered against Bohna in favor of Stevens. Am.1987 Initiative Proposal No. 2 § 4 (Certified 1988).

Alaska Statute 09.17.080(d) as it existed in 1986 provided that joint tortfeasors were jointly and severally liable for all of plaintiff's damages, except that a tortfeasor could not be jointly liable for more than twice its percentage of fault.[16] Thus, the trial court erred in reducing HT's liability in accordance with its percentage of fault. Applying the appropriate version of AS 09.17.080(d), we hold that HT is jointly and severally liable for Bohna's damages except that HT may not be liable for more than twice its percentage of fault.

#### 2. *Deduction for Comparative Negligence or Failure to Mitigate Damages.*

■ The jury allocated 15% of the total fault to Bohna for his comparative negligence and failure to mitigate his damages. Bohna argues that there should have been no deduction because neither the comparative negligence nor the failure to mitigate theories should have gone to the jury.

#### a. Comparative Negligence.

HT argues that Bohna was comparatively negligent by failing to inform HT of his dyslexia, a condition which might have impaired his ability to give informed con-

The court shall enter judgment against each party liable on the basis of joint and several liability, except that a party who is allocated less than 50 percent of the total fault allocated to all of the parties may not be jointly liable for more than twice the percentage of fault allocated to that party.

sent to the excess offer strategy.[17] Bohna maintains that this was not at issue because during the trial he withdrew his claim that he lacked capacity to give informed consent. Thus Bohna argues the trial court erred in instructing the jury on comparative negligence.

In order for Bohna to prevail on this question, we must find, after reviewing the record, that HT's claim for comparative negligence was limited to the dyslexia issue, and that Bohna withdrew any claim that he lacked capacity due to dyslexia. We find that the record supports Bohna's position.

First, in response to Bohna's motion for directed verdict on the issue of comparative negligence, HT's attorney stated that

> [w]ith regard to the comparative negligence issue, I thought about that over the weekend, as to what the elements of comparative negligence are here, and I think there's one are[a]; ... and this is dependent upon what they're going to claim, but I think that they have claimed it and there is evidence on both sides of the issue. And, that is Phil Bohna—if Phil Bohna is contending that he did not understand what he was doing because he had some sort of a disability, then it is our contention that he was negligent in not making that known to us....
>
> That is *the only area* that I am currently aware of, after having really thought about it and reviewed my notes and that sort of thing, that gets into the comparative negligence area.

(Emphasis added.) HT's attorney took the same position in closing argument to the jury:

> [I]n terms of [Bohna's] negligence, there's *only one area;* and that is if Mr. Bohna, and maybe this is no longer a contention for Mr. Sandberg's argument. If Mr. Bohna ... wants you to believe that somehow he did not understand or

was impaired in his ability ... to give informed consent, then he was negligent for not informing Hughes, Thorsness of his impairment.... [T]hat may no longer be an issue in the case if Mr. Sandberg means what he says about they're not contending that he didn't understand.

(Emphasis added.) Thus, HT's claim for comparative negligence was limited to Bohna's dyslexia.

Second, Bohna's attorney confirmed in closing argument that Bohna withdrew any claim based on lack of capacity:

> Mr. DeLisio discussed the fact that whether or not Mr. Bohna is somehow comparatively negligent, and he said he doesn't make that claim unless we claim that Mr. Bohna lacked the capacity to sign the consent. We don't make that claim.

Before the trial court instructed the jury, Bohna moved to withdraw the issue of comparative negligence from the jury's consideration, but the trial court denied the motion. In this the trial court erred because together these representations by counsel effectively withdrew the issue of comparative negligence from the case.

b. Failure to Mitigate.

Bohna maintains that no instruction on failure to mitigate should have been given, arguing that "[a]n insured client has no duty to take bankruptcy to mitigate the damages for which his lawyer or insurer may be liable." HT counters that under the facts of this case Bohna did have a duty to mitigate his damages by attempting to discharge his debt in bankruptcy because: 1) he was advised that if he agreed to the excess offer of judgment strategy, he would likely have to attempt to discharge the excess judgment in bankruptcy; and 2) after consulting with an independent attorney, he indicated that he would follow that strategy.[18] We agree

---

17. HT also argues that Bohna was comparatively negligent in failing to consult with independent counsel more than once regarding the excess offer strategy. In light of representations made by HT discussed below, we find that HT has waived this argument.

18. HT also argues that this issue is not properly before the court since Bohna did not list it in his Statement of Points on Appeal. However, Bohna listed as error the "making [of] any deduction from the verdict amount for any supposed fault of Phillip Bohna." This covers the issue of failure to mitigate damages.

with Bohna and hold that the trial court should not have instructed the jury on mitigation.

Although the parties frame this issue as a question of duty, we note that Bohna's bankruptcy would not have reduced HT's liability. HT's malpractice not only caused Bohna to incur liability to Stevens, but also created an asset. This asset is Bohna's malpractice claim against HT. Had Bohna filed for bankruptcy, a court would have appointed a bankruptcy trustee whose duties would have included collecting all of Bohna's assets including his malpractice claim against HT. *See* 4 *Collier on Bankruptcy* § 541.10(a)(1) (15th ed. 1987) (The bankruptcy "estate includes causes of action belonging to the debtor."). The only thing that would have changed had Bohna filed for bankruptcy is that the named plaintiff in the present case would have been the bankruptcy trustee rather than Bohna. *Hanover Ins. Co. v. Tyco Indus. Inc.*, 500 F.2d 654, 657 (3d Cir.1974) (The bankruptcy trustee is "authorized, exclusively, to bring actions that could have been instituted by the bankrupt.").

Moreover, even if Bohna's bankruptcy would have reduced HT's liability, we hold as a matter of public policy that the duty to mitigate does not extend to filing for bankruptcy.[19] As we observed in *Anchorage Independent School District v. Stephens*, 370 P.2d 531, 533 (Alaska 1962), the rationale behind the duty to mitigate damages "is a recognition that legal rules are designed not only to prevent and repair individual loss and injustice, but to protect and conserve the economic welfare and prosperity of the whole community." No one's interests are served by allowing a plaintiff to recover as damages that which the plaintiff could have reasonably avoided in the first place.

Under the present circumstances, Bohna's bankruptcy would not serve the long-run economic welfare and prosperity of the community. This is so because the primary victim in this case is Stevens. Bohna's injury derives from Stevens' injury. Unfortunately, there is no way Bohna could "mitigate" the damages he caused Stevens.

On the other hand, Bohna had liability insurance which serves two purposes: to protect Bohna from the financial ruin of having to pay Stevens' loss, and to compensate Stevens for his loss. The offer of judgment strategy was clearly in conflict with both purposes. First, liability insurance is supposed to protect an insured from bankruptcy, rather than facilitate an insured's entry into that process. Second, insureds and their insurers cannot agree to reduce applicable insurance coverage after an accident occurs. That was the objective of the excess offer of judgment strategy, which necessarily included Bohna's bankruptcy.[20] This strategy contravened public

---

**19.** A number of authorities support this holding. *See Levantino v. Insurance Co. of North America*, 102 Misc.2d 77, 422 N.Y.S.2d 995, 1002 (Sup.Ct.1979) ("Nor should a plaintiff be required to undergo a bankruptcy in order to benefit the wrongdoer who has caused his financial distress in the first place. To be compelled to seek a bankruptcy discharge under such circumstances may be a significant loss for the sensitive or those who have a reasonable likelihood of ever requiring credit."); *Alford v. Textile Ins. Co.*, 248 N.C. 224, 103 S.E.2d 8, 12 (1958) (dictum) (The insurer's liability would not "be affected or diminished by the question of solvency or insolvency of its insured."); *Southern Fire & Casualty Co. v. Norris*, 35 Tenn. App. 657, 250 S.W.2d 785, 792 (1952) (quoting *Schwartz v. Norwich Union Indem. Co.*, 212 Wis. 593, 250 N.W. 446, 446 (1933) ("Neither the right of action nor the measure of damages depends upon the fact of [the insured's] payment" of the underlying liability.); 22 Am. Jur.2d *Damages* § 502 ("The doctrine of avoidable consequences does not include ... filing for bankruptcy."); Keeton, *Liability Insurance and Responsibility for Settlement*, 67 Harv. L.Rev. 1136, 1181 (1954) (In an excess judgment situation, "[t]here should be no duty [on the part of the insured] to go through bankruptcy.").

**20.** In this probable liability, catastrophic injury case, Allstate had the duty to make a policy limits offer to Stevens. *Schultz v. Travelers Indem. Co.*, 754 P.2d 265, 266–67 (Alaska 1988) (per curiam). This included "the amount of attorney's fees which would have been awarded had [the] case gone to trial." *Id.* at 267. As a result of obtaining Bohna's consent to the excess offer strategy, Allstate ended up paying attorney's fees on the "contested without trial" column of $116,897.53. By contrast the attorney's fees which would generally have been awarded on a $4.6 million judgment following a trial would have been $462,500. Thus, total policy

policy.[21] As a matter of law, Bohna's decision not to follow that strategy cannot be considered a failure to mitigate damages.

For these reasons, we conclude that the trial court erred in deducting $920,931.74 for Bohna's alleged comparative fault or failure to mitigate damages. With only Allstate and HT left to share the fault, they are responsible for the 15% which the jury assigned to Bohna. They share this additional burden in the ratio originally allocated between them by the jury, 51/34. This results in Allstate's fault totalling 60% and HT's totalling 40%.

### 3. *Deduction for the Loan Receipt Agreement (LRA).*

■ All parties contend that the trial court erred in its treatment of the LRA. Bohna and Allstate[22] maintain that it was error for the court to deduct any portion of the $3 million loan from the jury verdict. HT argues that, for various reasons, the LRA violates Alaska law and public policy, and thus the entire $3 million should have been deducted from the verdict.[23]

Loan receipt agreements originated as a mechanism for insurance companies to compensate their insured who had suffered injury or damage while preserving their rights against potentially liable third parties. After the insured suffered a loss, the insurer would loan the amount of the loss to the insured with the loan to be repaid out of any recovery against a third party. Structuring the transaction as a loan also allowed the insurer to avoid being the named plaintiff in a subsequent action to determine liability.[24] Early in this century, the United States Supreme Court approved the use of the LRA in this context. The Supreme Court recognized the LRA had the laudable effect of promptly delivering compensation to the injured plaintiff. *See Luckenbach v. W.J. McCahan Sugar Refining Co.*, 248 U.S. 139, 149, 39 S.Ct. 53, 55, 63 L.Ed. 170 (1918). This type of arrangement is still generally considered lawful. *See* 16 *Couch on Insurance* § 61.79 (M. Rhodes rev. 2d ed. 1983); Annot., 13 A.L.R.3d 48–49.[25]

Use of the loan receipt device has expanded beyond the insurer/insured context into the plaintiff/co-defendant context.[26]

limits were approximately $512,500, assuming, as HT thought, a probable verdict in the principal amount of $3 million, when pre-judgment interest is taken into account.

**21.** The legislature has determined that it is a matter of grave concern that motorists be financially responsible for their negligent acts so that innocent victims of motor vehicle accidents may be recompensed for the injury and financial loss inflicted upon them. AS 28.20.010.

**22.** HT argues that Allstate lacks standing to appeal the *Bohna* judgment because it is not a party to that judgment. Although Allstate's interest is not literally direct since the recovery would go initially to Bohna, Allstate has a strong interest in the matter. The LRA provides that Allstate gets the first $3 million plus interest from Bohna's recovery in the litigation against HT. Consequently, Allstate suffered an "injury-in-fact" by the trial court's partial setoff of the loan, and thus Allstate can provide "the adversity which is fundamental to judicial proceedings." *Moore v. State*, 553 P.2d 8, 23 (Alaska 1976). Allstate thus has standing to appeal the *Bohna* judgment.

**23.** HT in fact contends that $1,075,000 in addition to the $3 million loan and the $1 million settlement amount should be deducted from the final judgment because of the way the $4 mil-

lion was distributed. We fail to see how deducting more than the $4 million that Allstate paid might be justified under any theory.

**24.** For more details on the history of loan receipts, see Annotation, *Insurance: Validity and Effect of Loan Receipt or Agreement Between Insured and Insurer for a Loan Repayable to Extent of Insured's Recovery from Another*, 13 A.L.R.3d 42 (1967) [hereinafter "Annot., 13 A.L.R.3d"].

**25.** We have come across LRA's in this context as well. In *Municipality of Anchorage v. Baugh Construction & Engineering Co.*, 722 P.2d 919 (Alaska 1986), we determined that an LRA between a municipality and its insurer caused the insurer to become a "real party in interest" under Civil Rule 17(a). *Id.* at 925.

**26.** Some of these agreements guarantee the plaintiff a certain recovery without providing the plaintiff with a loan. However, they are substantially the same as LRA's in that the plaintiff is guaranteed a certain recovery and the settling defendant's ultimate liability is inversely related to the plaintiff's success against the nonsettling defendants. Some of the cases cited below labelled these agreements as Mary Carter agreements, Sliding Scale agreements, or Gallagher covenants. For ease of discussion,

Although not all courts have accepted LRA's in this context,[27] the majority have. A leading case in the area is *Reese v. Chicago, Burlington & Quincy R.R. Co.*, 55 Ill.2d 356, 303 N.E.2d 382 (1973). Expressing the policy reasons for upholding LRA's, the *Reese* court said:

> Because of the potential savings to some tortfeasors, funds under this arrangement will be more readily offered to injured plaintiffs than is the case under a covenant to forbear from suit or an outright settlement. Secondarily, loan receipts may tend to simplify complex multiparty litigation, and are desirable from the standpoint of facilitating private resolution of litigation.

*Id.* 303 N.E.2d at 386. These reasons have been persuasive to a number of other courts faced with LRA's between a plaintiff and a co-defendant. *See American Transport Co. v. Central Indiana Ry. Co.*, 255 Ind. 319, 264 N.E.2d 64, 67 (1970); *Crocker v. New England Power Co.*, 348 Mass. 159, 202 N.E.2d 793, 795 (1964); *Grillo v. Burke's Paint Co.*, 275 Or. 421, 551 P.2d 449, 452–53 (1976); *Jensen v. Beaird*, 40 Wash.App. 1, 696 P.2d 612, 618 (1985); *cf. Slaughter v. Pennsylvania X-Ray Corp.*, 638 F.2d 639, 643 (3d Cir.1981) (Penn. law); *City of Tucson v. Gallagher*, 108 Ariz. 140, 142, 493 P.2d 1197, 1199 (1972); *Firestone Tire & Rubber Co. v. Little*, 276 Ark. 511, 639 S.W.2d 726, 728 (1982), *rev'd on other grounds sub nom; Shelton v. Firestone Tire & Rubber Co.*, 281 Ark. 100, 662 S.W.2d 473, 475 (1983); *Webb v. Dessert Seed Co.*, 718 P.2d 1057, 1067 (Colo.1986); *General Motors Corp. v. Lahocki*, 286 Md. 714, 410 A.2d 1039, 1046 (1980); *Barlage v. The Place, Inc.*, 277 N.W.2d 193, 194–95 (Minn.1979); *O'Howell v. Continental Ins. Co.*, 654 S.W.2d 308, 308–09 (Mo.App.1983); *Hegarty v. Campbell Soup Co.*, 214 Neb. 716, 335 N.W.2d 758, 764–65 (1983); *Bedford School District v. Caron Constr. Co., Inc.*, 116 N.H. 800, 367 A.2d 1051, 1055 (1976); *Corn Exch. Bank v. Tri–State Livestock Auc-*

tion Co., 368 N.W.2d 596, 599–600 (S.D. 1985); *Stein v. American Residential Management*, 781 S.W.2d 385, 388–9 (Tex. App.1989); *Vermont Union School Dist. No. 21 v. H.P. Cummings Constr. Co.*, 143 Vt. 416, 469 A.2d 742, 748–50 (1983); *Reager v. Anderson*, 179 W.Va. 691, 371 S.E.2d 619, 630 (1988).

HT urges us to adopt the reasoning of Justice Schaefer's dissent in *Reese*. Justice Schaefer made a number of arguments against the use of LRA's in the plaintiff/co-defendant context. First, he argued that such use undermines the doctrine that prohibits assignment of a cause of action for personal injuries. Second, he attacked the majority's policy justifications for the LRA. He argued that the law should not permit one defendant to pay to influence the plaintiff to pursue other defendants. He also denied that the LRA facilitated the private resolution of litigation since it required the plaintiff to pursue the nonsettling defendant. Finally, Justice Schaefer argued that the LRA could throw the entire loss onto the less blameworthy of two defendants. This may happen, according to Justice Schaefer, because the more blameworthy party has more to lose and is thus willing to pay more to secure an LRA from the plaintiff. *Reese*, 303 N.E.2d at 387–88 (Schaefer, J., dissenting).

We do not find that these points compel a rejection of LRA's. As we discuss below, we do not find that the LRA constitutes an illegal assignment. As for the concern about one defendant influencing the plaintiff to sue the others, it would seem that the plaintiff would usually sue the nonsettling defendant regardless of the existence of the LRA. The LRA simply allows the settling defendant to induce the plaintiff *not to sue him or her.* We also disagree with the objection that the LRA does not facilitate the private resolution of litigation. It is true that the LRA does not eliminate all litigation concerning a case. However, from the viewpoint of the settling defendant, the LRA clearly does pro-

we do not distinguish between these different labels.

27. *See, e.g., Moore v. Subaru of America*, 891 F.2d 1445 (10th Cir.1989) (LRA not a valid loan transaction under Oklahoma law).

vide a way to resolve claims against him or her. An LRA allows settling defendants to limit their liability and avoid some of the uncertainties inherent in litigation. Without the possibility of recoupment provided by LRA's, it is less likely that such defendants would settle. Finally, we do not find that the argument that LRA's allow the more blameworthy defendant to shift the entire liability to the less blameworthy party is a reason for invalidating LRA's. As we note below, the amount of the loan, as well as the amount of the settlement, is fully deductible from the award against the nonsettling defendant. With such deductions, the wholesale loss shifting which concerned Justice Schaefer cannot take place.

HT nevertheless maintains that the LRA "contracts away" the restriction in AS 09.-16.010(d) which provides that a settling tortfeasor is not entitled to contribution from a nonsettling joint tortfeasor whose liability is not extinguished by the settlement.[28] According to HT, the LRA allows Allstate, a settling tortfeasor, to obtain what effectively amounts to contribution from HT, a nonsettling tortfeasor, contrary to the intent of the Contribution Act. Despite HT's strenuous defense of what it believes to be the intent of the Contribution Act, the actual language of AS 09.16.010(d) does not preclude these types of agreements. Thus, we hold that the LRA does not violate AS 09.16.010(d).

HT attacks the LRA from another angle, arguing that it is inconsistent with the Code of Professional Responsibility and threatens the integrity of the judicial process. HT bases this claim on the realignment of interests created by the LRA. According to HT, the LRA is a collusive agreement which creates a "fertile environment for perjury," and misleads the jury since the agreeing defendant remains as a captioned defendant and not a "real" defendant.[29] We find HT's position to be without merit. The concerns were adequately met by allowing HT to disclose the realignment of interests to the jury and by letting the jury evaluate the witness' credibility.[30] *See Reese v. Chicago, Burlington & Quincy R.R. Co.*, 55 Ill.2d 356, 303 N.E.2d 382, 387 (1973).

■ Finally, HT attacks the LRA as an illegal assignment of a legal malpractice action. According to HT, the terms and conditions of the loan and the fact that some of the loan funds went to pay expenses associated with the litigation against HT "establish an assignment to Allstate." We disagree.

According to the terms of the LRA,

[p]ayment on the note is due at the time of and in the full amount of any money received by Phillip Bohna by reason of any claim arising out of or related to the August 21, 1981 automobile accident which injured Anthony Stevens ... including but not limited to the claims asserted against [HT].

At most, this establishes a partial assignment of the proceeds of the malpractice claim against HT, not the cause of action itself.[31] Although we have not directly ad-

---

**28.** AS 09.16.010(d) (repealed eff. 3/5/89) provided:

A tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury or wrongful death is not extinguished by the settlement nor in respect to any amount paid in a settlement which is in excess of what was reasonable.

**29.** HT also argues that the LRA compromises jury selection because the settling defendant will use its peremptory challenges for the plaintiff's benefit. We discuss this concern later and find it to be groundless. *See infra* note 47.

**30.** In *Breitkreutz v. Baker,* 514 P.2d 17, 29 n. 30 (Alaska 1973), we noted that juries should be informed when settlements change the normal

interests of a party. This admonition was followed in this case as the LRA was an exhibit for the jury to review, HT cross-examined witnesses about the LRA, and HT painted its own picture of the LRA in its opening and closing statements. This type of full disclosure to the jury is what distinguishes the present case from *Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347 (1971), a case relied on heavily by HT.

**31.** We are not alone in rejecting the argument that an LRA constitutes an assignment of a cause of action. *See, e.g., Cullen v. Atchinson, Topeka & Santa Fe Ry. Co.,* 211 Kan. 368, 507 P.2d 353, 360 (1973); *O'Howell v. Continental Ins. Co.,* 654 S.W.2d 308 (Mo.App.1983). *But see Tober v. Hampton,* 178 Neb. 858, 136 N.W.2d 194 (1965).

dressed the validity of the assignment of the proceeds of a legal malpractice claim, we did not disapprove of the practice in *Continental Ins. Co. v. Bayless & Roberts, Inc.*, 608 P.2d 281, 286 (Alaska 1980). Other courts have explicitly upheld the validity of such assignments. *See e.g., Weston v. Dowty*, 163 Mich.App. 238, 414 N.W.2d 165, 167 (1987); *First Nat'l Bank of Clovis v. Diane, Inc.*, 102 N.M. 548, 557, 698 P.2d 5, 14 (App.1985). We agree with these authorities.

■ Having concluded that the LRA is a valid settlement device,[32] the next question is whether any part of the loan must be deducted from the judgment against HT. The statute relevant to this issue is AS 09.16.040 (repealed eff. 3/5/89) which provides:

> When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death
>
> (1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the *amount of the consideration paid* for it, whichever is the greater; and
>
> (2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.[33]

(Emphasis added.)

The trial court determined that the portion of the loan which Bohna must repay was not consideration paid for the release given Allstate. We disagree. A loan may be consideration for an exchanged benefit as readily as an unconditional payment. *See Credit Alliance Corp. v. Cornelius & Rush Coal Co.*, 508 F.Supp. 63, 66 (N.D.Ala.1980) (Ala. law) (a loan is consideration for an exchanged benefit). Further, if the loan amount of an LRA is not treated as consideration, the widespread use of LRA's will have troubling implications. Neither plaintiffs nor settling defendants would have any incentive not to structure 100% of all settlements as LRA's. Such a tactic would result in an undue shifting of losses to nonsettling defendants. There is authority in other jurisdictions which mirrors this view. *E.g., Cullen v. Atchinson, Topeka & Santa Fe Ry. Co.*, 211 Kan. 368, 507 P.2d 353, 362 (1973) ("[A]nything received by way of a covenant not to sue operates as a payment *pro tanto* upon any judgment obtained against the others.") (citation omitted); *Reager v. Anderson*, 179 W.Va. 691, 371 S.E.2d 619, 632 (1988).

We recognize that most jurisdictions deduct no part of the loan amount or only deduct the portion of the loan amount which plaintiffs do not repay. *See Webb v. Dessert Seed Co.*, 718 P.2d 1057, 1067 (Colo.1986); *Popovich v. Ram Pipe & Supply Co.*, 82 Ill.2d 203, 45 Ill.Dec. 167, 170, 412 N.E.2d 518, 521 (1980); *American Transp. Co. v. Central Indiana Ry. Co.*, 255 Ind. 319, 264 N.E.2d 64, 67 (1970); *Pacific Indem. Co. v. Thompson–Yaeger, Inc.*, 258 N.W.2d 762, 765 (Minn.1977); *Grillo v. Burke's Paint Co.*, 275 Or. 421, 551 P.2d 449, 454 (1976).[34] However, these

---

**32.** Under Alaska's Uniform Contribution Among Tortfeasors Act, the settlement is valid as long as it was entered into in good faith. We have indicated that this does not require that the settling parties advance the interests of the nonsettling defendant. Rather, they must simply refrain from "tortious or other wrongful conduct." *Vertecs Corp. v. Fiberchem, Inc.*, 669 P.2d 958, 961 (Alaska 1983) (quoting *Dompeling v. Superior Court*, 117 Cal.App.3d 798, 173 Cal. Rptr. 38 (1981)).

**33.** An identical provision is codified as AS 09.-17.090 (eff. 6/11/86) and was repealed in 1987, chapter 14, section 17, SLA 1987. This section is also identical to § 4 of the Uniform Contribution Among Tortfeasors Act, 12 U.L.A. 98 (1975).

**34.** California takes a third approach under which the "economic value" of the LRA is deducted. *Abbott Ford Inc. v. Superior Court*, 43 Cal.3d 858, 239 Cal.Rptr. 626, 741 P.2d 124 (1987). This is left in the first instance for the settling parties to determine. Under California law, the concept of good faith has been defined broadly so that a settlement amount which is so low as to be, as the California court puts it, "out of the ballpark" is not in good faith, and thus the settlement is invalid. Therefore, in California the parties have some incentive to express a

jurisdictions do not appear to be construing language similar to the "consideration paid" language of AS 09.16.040.[35] Thus, although there seem to be more jurisdictions which do not deduct amounts loaned under an LRA than do, our position does not run counter to the uniformity of interpretation clause of Alaska's Uniform Contribution Act.[36]

### 4. Interest Calculations.

HT argues that the interest component of the final judgment was incorrectly computed in two ways. First, HT argues that the trial court erroneously compounded post-judgment interest on the pre-judgment interest element of the judgment in favor of Stevens. The *Stevens* judgment was for $3,000,000 in principal plus $1,619,876.72 in pre-judgment interest plus costs and attorney's fees. HT claims that when the trial court calculated the pre-judgment interest on the *Bohna* judgment against HT, no interest on the $1,619,876.72 component should have been awarded.

■ This argument is without merit. Pre-judgment interest is an element of compensation. *Farnsworth v. Steiner*, 638 P.2d 181, 184 (Alaska 1981). When a judgment is entered, pre-judgment interest becomes part of the judgment. After pre-judgment interest is added to the principal amount found by the court or jury, Civil Rule 82 attorney's fees are calculated based on the total award, referred to in Civil Rule 82 as the "money judgment." *Id.* at 185. It follows that pre-judgment interest is also part of the judgment on which post-judgment interest is calculated.

HT argues that the court erred by continuing to accrue pre-judgment interest on Bohna's judgment against HT after October 27, 1989, when Stevens gave Bohna a partial satisfaction of judgment for $4 million. The date of the partial satisfaction is not relevant. If Bohna were a wealthy man and had paid Stevens $4 million of his own funds in exchange for a partial satisfaction, the partial satisfaction of judgment would clearly not signal an end to the accrual of pre-judgment interest on Bohna's claim against HT. The fact that the $4 million in this case came from Allstate rather than Bohna does not alter this conclusion. However, independent of the satisfaction, when Bohna received the $4 million from Allstate which reduced Bohna's claim against HT by $4 million under AS 09.16.040(1), he was not thereafter entitled to receive pre-judgment interest on that amount from HT. Thus, pre-judgment interest should have been calculated on $4,569,876.72 [37] until October 19, 1989, when the $4 million settlement was paid to Bohna. Thereafter, pre-judgment interest should have been calculated on $569,876.72.

### 5. Summary of Judgment Calculations.

Although a number of other issues are raised by the parties, none changes the calculation of the judgment. For purpose of clarity, we will set out at this point the calculations required by this opinion.

| | | |
|---|---|---|
| $6,139,544.94 | = | Verdict before deductions. |
| − 125,424.64 | = | Interest on $4 million at 10.5% from 10/20/89 to 2/6/90. |
| $6,014,120.30 | = | Verdict adjusted to eliminate pre-judgment interest on $4 million settlement amount paid to Bohna as required by AS 09.16.040(1). |
| −4,000,000.00 | = | Settlement amount paid Bohna, adjusted as required under AS 09.16.040(1). |

reasonable consideration. We define the concept of good faith more narrowly than California. Under Alaska law, what is required is honesty and disclosure but not a concern for the effect of the settlement on other defendants. *Vertecs Corp. v. Fiberchem*, 669 P.2d 958, 961 (Alaska 1983). Thus, permitting the parties to a settlement to determine the "economic value" of an LRA would not be acceptable under Alaska law.

**35.** Moreover, we know of no case other than *Abbott Ford* which has squarely come to grips with the question of whether the term "consideration paid" includes an amount loaned. As previously discussed, we do not believe that the *Abbott Ford* approach is advisable in Alaska. *See supra* note 34.

**36.** AS 09.16.050 provides: "This chapter shall be interpreted and construed as to effectuate as far as practical the general purpose of making uniform the law of those states that enact it."

**37.** *See supra* note 14.

$$\begin{array}{ll}
\$2,014,120.30 = & \text{Adjusted verdict after interest and} \\
& \text{settlement deductions.} \\[4pt]
\hline \\[-6pt]
\$6,014,120.30 = & \text{Adjusted verdict after interest de-} \\
& \text{duction multiplied by twice the to-} \\
& \text{tal fault allocated to HT.} \\
\times .80 & \text{(The ``cap'' formula of AS} \\
\hline
\$4,811,296.20 & \text{09.17.080(d) (see supra n. 16).)}
\end{array}$$

Since the amount of the verdict resulting from application of the "cap" formula is more than the adjusted verdict under AS 09.16.040(1), the adjusted verdict of $2,014,120.30 is the proper principal judgment against HT.

## B. OTHER ISSUES RAISED BY BOHNA

### 1. *Punitive Damages.*

■ Bohna argues that the trial court prejudiced his claim for punitive damages [38] by granting partial summary judgment to HT on the issue of fiduciary fraud. The trial court ruled that Bohna's complaint failed to allege fiduciary fraud with the specificity required by Civil Rule 9(b).[39] Further, Bohna argues that his subsequent request to amend his complaint to more specifically allege a claim for fiduciary fraud was erroneously denied. The jury concluded that punitive damages against HT were not otherwise appropriate in this case.

Our review of the record leads us to conclude that Bohna probably suffered no prejudice because of the trial court's rulings concerning his fiduciary fraud punitive damages claim. The trial court instructed the jury that punitive damages could be awarded if it found HT's conduct to be "outrageous because of [HT's] evil motives toward the plaintiff or its reckless indifference to his rights." Bohna was permitted to present evidence relating to an attorney's fiduciary duties to his client. At final argument he urged the jury to make an

award of punitive damages against HT because HT had been loyal to Allstate at Bohna's expense and thus was recklessly indifferent to his rights. We conclude therefore that even if the trial court erred in its rulings concerning Bohna's claim for fiduciary fraud, such error was harmless.

## C. ADDITIONAL CLAIMS RAISED BY HT

### 1. *Assignment of the Cause of Action Against HT to Stevens.*

■ In a motion for summary judgment, HT challenged the agreement between Stevens and Bohna, contending that it constituted an impermissible assignment of Bohna's malpractice claim against HT. After considering case law from Alaska and other jurisdictions, the trial court concluded that "[o]n its face, the assignment is for more than the proceeds from the recovery in this case [and thus] the assignment is invalid on its face." The court, however, did not dismiss Bohna's claim for malpractice against HT.

HT argues that Bohna's malpractice claim against HT should have been dismissed because Bohna illegally assigned his cause of action to Stevens.[40] We disagree. Assuming that the Stevens–Bohna agreement constituted an assignment, it was held invalid by the trial court. Therefore, Bohna retained his cause of action against HT and proceeded to enforce it.

### 2. *Motion for Directed Verdict.*

At the close of Bohna's case-in-chief, HT moved for a directed verdict, claiming that Bohna's experts had failed to establish the standard of care by which the jury was supposed to judge HT's actions. The motion was denied. HT argues that the denial

---

**38.** In his complaint, Bohna alleged that "Hughes Thorsness recklessly and wantonly disregarded the legitimate interests of Bohna as ... legal client ...," and with prior knowledge that said conduct was wrongful as herein described." Bohna requested $12,000,000.00 in punitive damages.

**39.** Civil Rule 9(b) provides:
In all averments of fraud or mistake, the circumstances constituting fraud or mistake

shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

**40.** This argument is in addition to the argument previously discussed and rejected that Bohna's claim against HT should have been dismissed because the LRA constituted an illegal assignment to Allstate. *See supra* Part A.3, pp. 27–28.

was error, that the judgment for Bohna should be reversed, and the case dismissed or remanded for a new trial.

■ When reviewing the denial of a motion for directed verdict we do not weigh conflicting evidence or judge the credibility of the witness; rather, we determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable people could not differ in their judgment. If there is room for diversity of opinion among reasonable people, the question is properly for the jury. *Petersen v. Mutual Life Ins. Co.*, 803 P.2d 406, 410 (Alaska 1990).

■ In *Drake v. Wickwire*, 795 P.2d 195 (Alaska 1990), we held that expert evidence is required "to establish a breach of an attorney's duty of care, except in non-technical situations where negligence is evident to lay people or where the fault is so clear as to constitute negligence as a matter of law." *Id.* at 196. Such evidence was presented in this case. Leroy Barker, an insurance defense specialist called by HT, admitted on cross-examination that "[a] defense attorney who exposed his own client to an excess judgment when he could have used insurance company money to settle the case wouldn't [meet] the standard of care of [the] community." Based on this evidence, reasonable jurors could have concluded that HT breached the duty of care it owed to Bohna.[41] Thus, the trial court

properly denied HT's motion for a directed verdict.[42]

### 3. *Peremptory Challenges.*

HT requests a new trial because it was granted the same number of peremptory challenges as were given Bohna and Allstate considered separately. HT argues that Bohna and Allstate did not have adverse interests, and hence under Civil Rule 47(d) they should have been treated as a single party for the purpose of awarding peremptory challenges. Failure to do so, according to HT, impaired its right to a fair and impartial jury. Bohna responds that HT cannot complain about not being awarded more peremptory challenges when it failed to use all those which it was awarded.[43]

Civil Rule 47(d) governs peremptory challenges and provides in part:

Each party may challenge peremptorily three jurors. Two or more parties on the same side are considered a single party for purposes of peremptory challenge, but where multiple parties having adverse interests are aligned on the same side, three peremptory challenges shall be allowed to each such party represented by a different attorney.

By ruling that Bohna, Allstate, and HT would each be allowed four peremptory challenges,[44] the trial court implicitly deter-

---

**41.** Although Barker did not testify until after HT's motion for a directed verdict, his testimony is properly considered on appeal. *Cf. Martin v. City of Fairbanks*, 456 P.2d 462, 464 (Alaska 1969) ("On appeal the record as a whole is viewed, not just the prosecution's case-in-chief, regardless of when a motion of acquittal is made."). We have applied *Martin's* reasoning in the civil context as well. *See United Bank Alaska v. Dischner*, 685 P.2d 90, 94 n. 5 (Alaska 1984) ("All of the evidence regardless of which party has introduced it should be considered in determining whether a presumption has been rebutted.") (citing *Martin*).

**42.** For the same reasons, we find no error in the denial of HT's motion for judgment notwithstanding the verdict.

HT also disputes the trial court's denial of HT's motion for a new trial. However, upon reviewing the entire record, we cannot say that the "evidence to support the verdict was completely lacking or was so slight and unconvinc-

ing as to make the verdict plainly unreasonable and unjust." *Sloan v. Atlantic Richfield Co.*, 541 P.2d 717, 724 (Alaska 1975) (quoting *Ahlstrom v. Cummings*, 388 P.2d 261, 262 (Alaska 1964)). Indeed, for us to reach that conclusion, we would have to discount the testimony of Barker, a witness called by HT.

**43.** Bohna also argues that HT is precluded from raising this issue now because it never objected to the trial court's decision to award each party the same number of peremptory challenges. However, the trial transcript reveals that, prior to voir dire, HT raised the issue, received an adverse ruling, and indicated the basis of its disagreement with that ruling. The point was therefore properly preserved. *See* Alaska R.Civ.P. 46(f); *see also Blades v. DaFoe*, 704 P.2d 317, 323 (Colo.1985).

**44.** Initially, the court allowed each party three peremptory challenges, but by agreement of the parties relating to the issue of alternate jurors, this was subsequently raised to four.

mined that Bohna and Allstate were parties having adverse interests. This is a factual determination which we will not disturb unless clearly erroneous. Alaska R.Civ.P. 52(a).

▇ We do not believe that the interests of Bohna and Allstate were truly adverse. Allstate's liability to Bohna had been extinguished by the settlement agreement. By virtue of the LRA, both were interested in seeing the jury return a large verdict against HT. Allstate wanted a large verdict because the larger the verdict, the more likely it would recover fully on its loan. Bohna wanted a large verdict because he was obligated to pay Allstate only the loan principal plus interest. Given a sufficiently large verdict (with punitive damages, for example), he would be able to satisfy completely the *Stevens* judgment and keep any excess. Thus, the trial court's finding that Bohna and Allstate had adverse interests was clearly erroneous.

Bohna nevertheless maintains that HT must show that it was prejudiced by the court's erroneous award of peremptory challenges in order to justify reversal. HT responds that a requirement of prejudice in this context is senseless because peremptory challenges allow a party to remove a prospective juror for "intuitive and often unexplainable reasons." Thus, to require a showing of prejudice would in effect nullify Civil Rule 47(d).

There is no Alaska case law on whether a showing of prejudice should be required in order to obtain a new trial when one party is allowed too many peremptory challenges. However, under our harmless error rule, only errors which are "inconsistent with substantial justice" are grounds for granting a new trial. Alaska R.Civ.P. 61.[45] Further, where an error has been made in denying the challenge of a prospective juror for cause, Alaska case law requires a showing of prejudice, at least to the mini-

mal extent of requiring that a litigant exercise all available peremptory challenges. *Arnold v. State*, 751 P.2d 494, 501 (Alaska App.1988); *McGee v. State*, 614 P.2d 800, 807 (Alaska 1980); *City of Kotzebue v. Ipalook*, 462 P.2d 75, 77 (Alaska 1969).

The cases in other jurisdictions are divided on whether a showing of prejudice is required to warrant a new trial when excessive peremptory challenges are awarded to a litigant or to multiple litigants having the same interest. See *Effect of Allowing Excessive Number of Peremptory Challenges*, 95 A.L.R.2d. 957 (1970). The majority rule seems to be that some showing of prejudice is required:

> The numerical weight of authority in civil cases supports the rule that a judgment will not be reversed for error in allowing one or more peremptory challenges in excess of that provided by statute, unless the complaining party shows that he has exhausted his peremptory challenges and has suffered material injury from the action of the court, and that as a result thereof one or more objectionable jurors sat on the case, or for some other equally cogent reasons.

*Id.* at 963. For the reasons that follow, we align Alaska with this view.

An impartial jury is fundamental to the American tradition of trial by jury. Peremptory challenges are thus not for the purpose of securing a jury biased for one's side or against the opponent's side. On the contrary, a primary purpose of peremptory challenges is to help secure an impartial jury. They permit each party to reject certain prospective jurors whom they believe, but cannot demonstrate, harbor some latent predisposition against their position or for the opponent's position.

Peremptory challenges are thus not an end in themselves, but rather a means to an end: an impartial jury. Where a party

---

**45.** Alaska Civil Rule 61 provides:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modify-

ing or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

receives an impartial jury, the issue of peremptories is moot. The question is thus whether HT obtained a fair jury despite the imbalance of peremptories. In light of what has been set out above, we know first of all that Bohna and Allstate were able to strike four people from the jury who presumably should have been able to remain there. Whether or not any or all of these people were biased in some fashion, HT has no basis to complain as long as four unbiased people were selected in their places.[46] We have no reason to doubt that this is what happened here. First, HT does not claim that any of the people who ultimately served on the jury should have been removed for cause but were allowed to stay by the trial court.[47] Second, HT did not use all the peremptory challenges which it was awarded.[48] This leads us to believe that HT did not even subjectively perceive that any of the people who served on the jury were biased against HT. Hence, we conclude that HT received a fair jury, and the trial court's erroneous allocation of peremptory challenges was harmless error. Alaska R.Civ.P. 61.

### 4. *Satisfaction of Judgment.*

■ On November 10, 1987, Bohna and Stevens agreed that Stevens would enter into a covenant not to execute upon the judgment against Bohna pending the outcome of the action against HT. In turn, Bohna agreed that he would, among other things, diligently pursue his claims against Allstate and HT. Stevens' partial covenant

not to execute was superseded by a permanent covenant not to execute dated October 27, 1989. In the latter document, Stevens covenanted not to execute upon the judgment against Bohna except to the extent that Bohna obtained a recovery against HT.[49]

Citing the covenant not to execute, HT urges this court to reverse the judgment and dismiss Bohna's cause of action. HT's theory is that, because of the covenant not to execute, Bohna did not suffer a loss sufficient to permit him to maintain suit against HT. The terms of the covenant fail to support this claim. The proceeds from Bohna's lawsuit were explicitly left subject to execution. By the terms of the November 10 agreement, Bohna was required to pursue diligently his cause of action against HT. Failure to do so would have been a material breach of the agreement. In such a case, Bohna would no longer be able to assert the covenant not to execute in order to bar Stevens from executing on the judgment against Bohna. Because of this vulnerability to execution on the *Stevens* judgment, Bohna retained the element of loss despite the covenant not to execute. *Cf. Continental Ins. Co. v. Bayless & Roberts, Inc.,* 608 P.2d 281 (Alaska 1980) (no plain error under similar circumstances).

### 5. *Evidentiary Points.*

HT lists as error various rulings by the trial court excluding the presentation of

---

46. A party has a right to an impartial jury, not to have certain individuals on the jury, as suggested by HT.

47. Here, as in *Goldstein v. Kelleher,* 728 F.2d 32 (1st Cir.1984),

> [t]here is nothing to show either that [the complaining party] was dissatisfied with any of the jurors finally selected or wished to select someone else. We think that before a reversal is granted, the complaining party should be able to point to some convincing indication in the record that if a further peremptory challenge had been allowed, he meant to challenge one or more jurors.

728 F.2d at 38.

48. In the federal courts, which have a harmless error rule similar to Alaska Civil Rule 61, "one who does not exercise all of his peremptory challenges cannot assign as error the court's

refusal to allow a greater number." *Goldstein v. Kelleher,* 728 F.2d 32, 37 (1st Cir.1984).

49. The full text of the document reads:

COVENANT NOT TO EXECUTE

I, Anthony Stevens, hereby covenant not to execute upon the judgment which I have obtained against Phillip Bohna in the case of [*Stevens v. Bohna*] except:

1. To the extent that Phillip Bohna obtains a recovery against Hughes, Thorsness, Gantz and Brundin in the case entitled [*Bohna v. Hughes Thorsness*].

This [supersedes] my previous partial covenant not to execute upon Mr. Bohna in which I agreed not to execute during only the pendency of [*Bohna v. Hughes Thorsness*]. By this covenant, I agree not to execute on any assets of Mr. Bohna, except proceeds from the above lawsuit, forever.

certain testimony and the introduction of certain documents into evidence. We review such rulings for abuse of discretion. We will find that a trial court abused its discretion when we are left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling. *In re D.J.A.*, 793 P.2d 1033, 1035–36 n. 2 (Alaska 1990). Moreover, a party may not assign as error the exclusion of evidence unless the exclusion is inconsistent with substantial justice. Alaska R.Civ.P. 61; *see also* Alaska R.Evid. 103(a). We decline to overturn the jury verdict based on any of these evidentiary rulings since, assuming they were erroneous, we find the error to be harmless.

■■■ The first point raised by HT is the trial court's refusal to allow the expert testimony of Kenneth Treadwell, a former bankruptcy judge, on the issue of the dischargeability of Bohna's excess judgment in bankruptcy. The court determined that, at the time Powell proposed the excess offer strategy, whether or not Bohna could discharge the judgment in bankruptcy was legally uncertain. The court viewed the question facing the jury as: Given that contingency, what would a reasonable, prudent attorney do under those circumstances?

HT claims that it may have been prejudiced by this ruling because "there is no way of knowing the relation between the jury's finding of negligence and Hughes Thorsness' advice to Bohna on the contingency of non-dischargeability." As it happens, examining the special verdict form provides an easy way to determine this. Answering Question 1, the jury found that HT was negligent. However, Question 3 specifically asked if HT was negligent in making excess offers of judgment. The jury answered "No." Instead, the jury indicated in its answer to Question 6 that HT was negligent for reasons *other than* making excess offers of judgment. Given these findings, we see no manner in which HT may have been harmed by the court's

refusal to allow Treadwell's testimony on the dischargeability of the judgment.

Next, HT contends that the trial court erred by refusing to allow HT to introduce evidence of Bohna's blood alcohol level at the time of the collision or any similar evidence regarding Stevens. According to HT, the excluded evidence "went to the heart of the question of negligence." Yet HT fails to explain how any of this evidence, if introduced, might have affected the jury's finding that HT was negligent in ways other than making excess offers of judgment. HT vaguely claims that "[t]he jury was prevented from assessing the full factual basis from which Hughes Thorsness acted." This still does not identify the manner in which HT was prejudiced. Thus, we cannot say that we are left with a definite and firm conviction that the trial court erred.

■■■ Finally, HT assigns as error the trial court's refusal to allow into evidence Bohna's opposition to a motion made by Allstate, pursuant to Civil Rule 60(b), to deem the excess judgment against Bohna satisfied.[50] The trial court ruled that Bohna's opposition was irrelevant. HT alleges four ways in which the evidence of Bohna's opposition was relevant: 1) it relates to Bohna's failure to mitigate damages, 2) it shows Bohna's contributory negligence in that he breached his duty to assist Allstate in its defense of the Stevens suit, 3) it demonstrates a greater concern for amassing personal wealth than for eliminating the judgment against him, and 4) his memorandum in opposition contains a prior inconsistent statement on who caused the excess judgment.

HT's demand for a new trial on the ground that it was denied the opportunity to introduce evidence of Bohna's opposition to Allstate's Civil Rule 60(b) motion must be rejected. Even assuming that Bohna's opposition to the Civil Rule 60(b) motion was relevant, we cannot say that HT's inability to present this evidence probably affected the jury's verdict. Allstate's motion was so lacking in merit[51] that, even if the

**50.** Allstate made the motion after Bohna had sued Allstate but before they had settled.

**51.** Allstate argued that the $3 million Rule 68 offer of judgment which Stevens eventually ac-

jury had been informed of Bohna's opposition, it is unlikely that the jury would have concluded that his opposition affected the amount of damages he suffered. *See Poulin v. Zartman*, 542 P.2d 251, 261 (Alaska 1975). Nor are we convinced that this evidence was so probative in exposing Bohna's motive or shaking his credibility that its exclusion probably affected the jury's verdict. *Id.* Thus, to the extent that the trial court's ruling was error, it was harmless error not justifying reversal and a new trial. Alaska R.Civ.P. 61; *In re D.J.A.*, 793 P.2d 1033, 1035–36 n. 2 (Alaska 1990).

### 6. *Jury Instructions Regarding Attorney Conduct.*

HT argues that it is entitled to a new trial because the trial court refused to give the jury certain proposed instructions concerning attorney malpractice. Specifically, HT wanted the trial court to: first, instruct the jury that an attorney's conduct cannot be judged by subsequent case law and that an attorney must be judged under circumstances similar to those existing at the time of the conduct; and, second, provide the jury with proposed clarifying instructions. In light of the trial court's actual instructions and because the issue of whether an attorney's conduct should be judged by subsequent case law was not raised before the jury, we hold that the trial court did not err by refusing to provide the jury with HT's proposed instructions.

 On the issue of attorney negligence, the trial court's instruction provided in part:

An attorney is negligent in the representation of a client if he breaches the required standard of care by failing to *use*

*such skill, prudence, and diligence as other attorneys commonly possess and would exercise under similar circumstances....*

An attorney is not necessarily negligent because he makes errors in judgment or because his efforts are unsuccessful. An attorney is negligent if the error in judgment or lack of success is due to his failure to *use such skill, prudence and diligence as other attorneys commonly possess and would exercise under similar circumstances.*

(Emphasis added.) During HT's presentation of its case, HT's expert witness testified that the required standard of care for an attorney is to analyze "the law that *is in existence at that time* ... [and] to exercise the diligence, skill, competence, prudence of a lawyer who is in similar practice here in Anchorage." [52] (Emphasis added.) HT did not cite to any instances where either Bohna or Allstate offered evidence that an attorney should be judged by subsequent case law. Thus, there was no need for the trial court to give the jury HT's proposed instruction on attorney negligence because the issue of whether HT should be judged by subsequent case law was never presented to the jury.

 As mentioned, HT also claims that the trial court erred by not providing the jury with proposed clarifying instructions. HT argues that because the trial court instructed the jury that it had ruled that Allstate had breached its duty of care to Bohna, the jury may have been confused into thinking that the trial court's ruling applied to HT as well.[53] HT claims it was further prejudiced from instances of opposing counsel eliciting testimony which allegedly suggested that HT was at fault for

---

cepted was in reality nothing more than a "contract whose sole purpose was to establish a basis for the calculation of Rule 82 attorney's fees owed under Bohna's insurance policy." However, if the parties simply wanted to agree on the measure of Rule 82 attorney's fees, they could easily have done so explicitly.

**52.** HT also introduced expert testimony that Powell and HT met the standard of care owed to Bohna.

**53.** In its August 17, 1989 Decision and Order, the trial court ruled as a matter of law that

Allstate had breached its duty to make a "policy limits" offer because it never made an offer which was capable of dollar value determination. This ruling was based on the retroactive application of our decisions in *Providence Washington Ins. Co. v. Fireman's Fund Ins. Cos.*, 778 P.2d 200 (Alaska 1989) and *Schultz v. Travelers Indem. Co.*, 754 P.2d 265 (Alaska 1988) (per curiam). The trial court informed the jury of its ruling, but not the reasoning upon which it was based.

not making a policy limits offer. We hold that the trial court's actual instructions adequately dealt with any possible confusion.

On the issue of duty, the trial court's instruction provided in part:

The court has ruled in this case that Allstate had certain duties to Bohna in this case and that it breached those duties. The court's rulings are based upon the policy language and the law which interprets those duties....

*These rulings of the court regarding Allstate, however, do not establish any duties owed by [HT] to Phillip Bohna.* The duties owed by [HT] to Bohna are established by the expert testimony which you have heard in this case. The jury must evaluate and weigh the expert testimony to decide first what duties were owed by [HT]; secondly, which, if any, of those duties were breached; and thirdly, whether those breaches legally caused loss to Bohna.

(Emphasis added.) The trial court further instructed the jury:

The insurance policy issued to Bohna provided coverage which had a dollar value to him. This *dollar value* is called "policy limits."

It is the duty of an insurance company to determine the dollar value of its policy limits. *No one else* has the duty to determine the dollar value of the policy limits for an insurance company.

(Underline in original, italics added.) These instructions clearly informed the jury that the trial court's ruling as to Allstate's breach of duty did not apply to HT, and that HT was not responsible for determining the value of policy limits nor making a policy limits offer.[54] As such, they were highly favorable to HT, since Allstate contended that it was relying on HT to advise it as to what policy limits would be given

the uniqueness of Alaska law regarding court awarded attorney's fees.

Moreover, the instructions proposed by HT would not have substantially clarified any confusion which may have existed. HT's proposed Instruction 8 would have advised the jury that an attorney "is not liable for being in error as to a question of law on which reasonable doubt may be entertained by well-informed lawyers," and that, prior to 1988, "rational disagreement was possible as to what comprised a tender of policy limits." This adds little if anything to the trial court's actual instruction which informed the jury that "[n]o one [besides the insurance company] has the duty to determine the dollar value of the policy limits for an insurance company." As for HT's other proposed instructions, they would not have aided HT in this regard.[55] We therefore conclude that the trial court did not err in denying HT's proposed clarifying instructions.

### 7. *Costs and Attorney's Fees Awarded to Bohna.*

After trial, Bohna moved for costs and attorney's fees. The trial court awarded Bohna $34,454.47 in costs and $92,700.00 in attorney's fees. HT claims that this was a double recovery because of the way in which part of the $4 million paid by Allstate was allocated: $250,000 was dedicated to a litigation fund out of which the litigation against HT was financed, while a total of $625,000 went directly to Bohna's attorneys. Thus, according to HT, the court awarded costs and fees constituted a double recovery.

 The award of costs and attorney's fees is committed to the broad discretion of the trial court. We will not find an abuse of that discretion absent a showing that the award was "arbitrary, capricious, manifest-

---

**54.** HT attacks the instruction as inadequate because the instruction provided that "[n]o one else has the duty to determine the dollar value of the policy limits for an insurance company," instead of stating that *HT* did not have such a duty. We fail to see any significant difference in meaning.

**55.** HT complains that its proposed Instructions 10 and 11 were not given. They would basically have instructed the jury that an attorney is not at fault for honest mistakes in judgment. As such, they were erroneous statements of the law since an attorney may indeed be liable for an *honest mistake in judgment* if it is also a negligent mistake.

ly unreasonable, or ... stem[med] from an improper motive." *Tobeluk v. Lind*, 589 P.2d 873, 878 (Alaska 1979). Since, in the present case, the trial court awarded fees in line with the Civil Rule 82 schedule, they are presumptively correct. *Babinec v. Yabuki*, 799 P.2d 1325, 1337 (Alaska 1990).

■ This case involves a private contract which funded the litigation for which costs and fees were ultimately awarded. The question is whether such a contract should affect the award of costs and fees. We have said that Civil Rule 82 is meant to provide partial compensation to a prevailing party. *Tobeluk* at 876. In our view, since all litigation must be financed in some way, the purpose of Civil Rule 82 is not defeated by private agreements which accomplish this. In this case, Bohna was able to obtain financing as part of the overall agreement with Allstate and Stevens. In the course of the litigation against HT, he incurred substantial legal costs and attorney's fees. He was thus entitled to partial compensation like any other prevailing party. There was no abuse of discretion. We note, however, that on remand, the court may revise its award of costs and fees when entering the judgment directed in this opinion.

## D. ALLSTATE INSURANCE COMPANY V. HUGHES THORSNESS

Prior to settling with Bohna, Allstate filed a cross-claim seeking indemnity from HT if Allstate were found liable to Bohna as a result of HT's actions. Allstate later sought indemnity for the $1 million it paid under the settlement agreement. We now turn to the issues arising out of Allstate's indemnity claim.

1. In a pre-trial hearing, the trial court determined that in order for Allstate to recover on its indemnity claim, Allstate had to be found fault free by the jury. The trial court made this determination based on our decision in *Vertecs Corp. v. Reichhold Chems., Inc.*, 661 P.2d 619, 626 (Alaska 1983), where we held that implied indem-

nity was not available between concurrently negligent tortfeasors.

■ Allstate maintains that the *Vertecs* rule does not apply to claims of implied *contractual* indemnity. HT argues to the contrary. However, when the parties filed their briefs, they did not have the benefit of our opinion on rehearing in *Fairbanks North Star Borough v. Kandik Construction, Inc.*, 823 P.2d 632 (Alaska 1991). There we vacated that part of the original *Kandik* opinion which left undecided the applicability of comparative fault principles to implied contractual indemnity claims. We squarely held that the *Vertecs* rule applies in such cases. In other words, we held that a defendant cannot recover on an implied contractual indemnity claim unless he or she is completely fault free with respect to the underlying damages for which indemnity is sought. *Kandik* at 638. Thus, the trial court was correct in ruling that Allstate's indemnity claim was barred if Allstate were found to be responsible in part for Bohna's damages.

2. By a pre-trial order dated August 15, 1988, the trial court set January 13, 1989, as the deadline for filing motions to amend the pleadings. With HT's consent, Allstate amended its answer to assert its initial cross-claim after this deadline. Allstate and Bohna eventually settled on October 19, 1989. On October 26, 1989, less than one month before the start of trial, Allstate sought leave to amend its cross-claim to assert direct causes of action against HT. The proposed amended cross-claim would have added claims for breach of a lawyer's duty to a client, breach of contract, and breach of an agent's duty to a principal. The trial court denied Allstate's motion to amend as untimely and prejudicial.

■ Allstate argues that the trial court abused its discretion [56] because Allstate's direct claims did not accrue until Allstate had suffered "actual damage" by settling with Bohna. Allstate also maintains that HT was not surprised or in any way prejudiced by the assertion of these direct causes of action.

---

56. The proper standard of review on this question is the abuse of discretion standard. *See*

*Magestro v. State*, 785 P.2d 1211, 1212 (Alaska 1990).

The trial court did not abuse its discretion in denying Allstate's motion to amend. Bohna initially brought suit against Allstate and HT on December 16, 1987. The trial court set January 13, 1989, as the deadline for filing motions to amend the pleadings. Allstate attempted to amend its cross-claim on October 26, 1989—over nine months after the filing deadline and only three weeks before a trial scheduled to last thirty days. In light of these facts, we hold that Allstate's motion to amend was properly rejected as untimely.[57]

3. Allstate next contends that the issue of whether it breached its implied covenant of good faith and fair dealing should have been allowed to go to the jury. Instead, the trial court ruled, as a matter of law, that Allstate had breached its covenant of good faith and fair dealing by 1) using excess offers of judgment in order to calculate Civil Rule 82 attorney's fees, and 2) not tendering "policy limits." We affirm.

■■■■ As we recently recognized, where an adverse verdict in excess of policy limits is likely, an insurance company has the duty to determine "the amount of a money judgment which might be rendered against its insured," and "to tender in settlement that portion of the projected money judgment which [it] contractually agreed to pay." *Schultz v. Travelers Indem. Co.,* 754 P.2d 265 (Alaska 1988) (per curiam). This duty required Allstate to offer Stevens a quantifiable dollar amount representing Allstate's obligation under the policy. *See Providence Washington Ins. Co. v. Fireman's Fund Ins. Cos.,* 778 P.2d 200 (Alaska 1989).[58] On September 16, 1986, in a letter to Allstate, Powell estimated that the verdict value of the case to be no less than $3 million. Using the "contested without trial" portion of the Rule 82 table, Powell estimated that Allstate's obligation under the policy was no less than $162,680 plus costs.[59] Yet Allstate never offered Stevens a specific dollar amount of more than $50,000. Thus, the trial court was correct in ruling that, as a matter of law, Allstate breached its obligation of good faith and fair dealing.[60]

## CONCLUSION

Entry of judgment in Bohna's favor was proper. However, the value of the jury

57. Citing *Wright v. Vickaryous,* 598 P.2d 490, 496 (Alaska 1979), Allstate contends that the trial court should have granted a continuance to allow the amended cross-claim. However, considering the number of witnesses involved, the proximity of the scheduled trial date, and the difficulties inherent in rescheduling such a large trial, we are not left with the definite and firm conviction that the trial court erred.

58. Although we decided both *Schultz* and *Providence Washington* after Allstate's wrongful conduct, the principles articulated in *Schultz* and *Providence* were not a change in the law and could have readily been anticipated based on Alaska case law existing at the time of Allstate's wrongful conduct. *See e.g., Insurance Co. of North America v. State Farm Mutual Auto. Ins. Co.,* 663 P.2d 953, 954 n. 1 (Alaska 1983) ("[S]ettlement ... was apparently intended to be within its policy limits inasmuch as [the amount of the settlement in excess of the bodily injury limit] is doubtlessly not more than the costs and attorney's fees which would have been assessed had the case gone to trial."); *Salmine v. Knagin,* 645 P.2d 148, 150 n. 8 (Alaska 1982) (The face amount of the policy plus court awarded attorney's fees following trial "could well be considered to be policy limits."); *Continental Ins. Co. v. Bayless & Roberts, Inc.,* 608 P.2d 281, 285

n. 6 (Alaska 1980) ("The face amount of the policy was $100,000. Since the policy also provided for payment of costs and attorney's fees, however, the $160,000 [settlement] figure did not necessarily exceed policy limits."). Moreover, the term "policy limits" is self-explanatory even without any prior cases. Policy limits necessarily are what an insurance company would have to pay under its policy if it went to trial and received an adverse verdict. If Allstate was genuinely confused as to the value of policy limits, it should have filed a declaratory action rather than exposing Bohna to personal liability.

59. In fact, actual policy limits approximated $512,500, assuming, as Powell thought, a verdict value of no less than $3 million. *See supra* note 20.

60. Allstate and HT raise still more issues relating to Allstate's indemnity claim. Allstate assigns as error the trial court's ruling that the determination of attorney's fees and costs in an indemnity action is a jury question. HT contends that the trial court erroneously denied its efforts to introduce into evidence certain of Allstate's pleadings and briefs. Both of these issues are moot in light of today's decision that Allstate may not recover on its indemnity claim.

verdict was incorrectly calculated and certain improper setoffs were made. First, the trial court erroneously concluded that the judgment against HT should be proportional to its fault. Second, the trial court incorrectly calculated the jury verdict by awarding pre-judgment interest on the $4 million paid by Allstate to Bohna, from the date of payment to the date the *Bohna* judgment was entered. Third, in determining setoffs, the trial court improperly deducted from the jury verdict for Bohna's supposed comparative fault and failure to mitigate his damages. Fourth, the court should have deducted from the jury verdict the full $3 million received by Bohna under the LRA. With corrections made for these errors, Bohna is entitled to entry of judgment against HT in the amount of $2,014,-120.30.

On Allstate's cross-claim, the judgment in favor of HT is affirmed.

AFFIRMED in part, REVERSED in part, and REMANDED.

COMPTON, J., concurs.

BURKE, J., not participating.

COMPTON, Justice, concurring.

The court concludes that the $3,000,000 "loan" provided for in the Loan Receipt Agreement (LRA) used by Allstate Insurance Company is "consideration" within the meaning of AS 09.16.040(1), and must be set off against the judgment obtained by Bohna. I agree. Since this issue is dispositive of the challenges to the LRA, there is no reason to address other challenges. I express no opinion whether I agree with the court's analysis of those challenges.