*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PADRM GOLD MINE, LLC, | ) | |
| | ) | Supreme Court No. S-17838 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-12-02432 CI |
| v. | ) | |
| | ) | O P I N I O N |
| PERKUMPULAN INVESTOR | ) | |
| CRISIS CENTER DRESSEL – WBG, | ) | No. 7568 – November 19, 2021 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael A. MacDonald, Judge.

Appearances: Joan Travostino, Dorsey & Whitney LLP, Anchorage, for Appellant. No appearance by Appellee. Chester Gilmore, Cashion Gilmore LLC, Anchorage, for Amicus Curiae Gazewood & Weiner, PC.

Before: Winfree, Maassen, Carney, and Borghesan, Justices. [Bolger, Chief Justice, not participating.]

MAASSEN, Justice.

## I. INTRODUCTION

A group of defrauded investors brought a lawsuit in Washington seeking to recover assets they alleged had been fraudulently conveyed to perpetrators of the fraud. The investors discovered that the alleged perpetrators owned land in Alaska in the

name of a mining company, and they filed an action in Alaska superior court for fraudulent conveyance and to quiet title to the property. The Washington case was later dismissed; the Alaska superior court then granted summary judgment against the investors, concluding that as a result of the dismissal of the Washington case they lacked the creditor status necessary to give them standing to pursue their Alaska claims. The court awarded attorney's fees to the mining company as the prevailing party.

The investors had only one apparent asset: a potential legal malpractice claim against their Alaska attorneys for having filed a fatally defective claim. The investors disavowed any intention of pursuing such a claim, but the mining company moved for a writ of execution, seeking the involuntary assignment of the potential claim to itself. The superior court denied the mining company's motion, concluding that Alaska law, for public policy reasons, did not allow the involuntary assignment of legal malpractice claims.

The mining company appeals. Because we agree with the superior court's conclusion that legal malpractice claims cannot be involuntarily assigned, we affirm its order denying the writ of execution.

## II.    FACTS AND PROCEEDINGS

### A.    Facts And Initial Proceedings

Perkumpulan Investor Crisis Center Dressel-WBG (Perkumpulan) is an Indonesian corporation representing over 3,000 Indonesian citizens who claim to have lost millions of dollars in an international fraudulent scheme operated primarily by a corporation called Dressel BVI. In 2009 Perkumpulan filed a federal lawsuit in Washington against the purported operators of the Dressel scheme, seeking damages

based on civil RICO[1] and related state law claims. The lawsuit was dismissed in March 2014, apparently following the settlement of some claims and the dismissal of others for lack of federal subject matter jurisdiction.

During discovery in that lawsuit, Perkumpulan had come to believe that some of the assets acquired by the Dressel scheme had been used to purchase property and mining claims in Alaska. In 2012 Perkumpulan brought an in rem action in Alaska state court seeking to quiet title to the properties and asserting claims of fraudulent conveyance against a variety of individuals and companies, alleging that the Dressel scheme's individual perpetrators had transferred ownership of the properties to themselves when it became clear that the scheme was collapsing. Among the defendants was PADRM Gold Mine, LLC, owner of some of the disputed properties. Perkumpulan hired several law firms, including an Alaska firm, Gazewood & Weiner PC, to litigate the Alaska lawsuit.

In December 2014 the superior court granted summary judgment to PADRM on the quiet title claim, concluding that Perkumpulan lacked the actual or constructive possession of the Alaska properties necessary to pursue such a claim. The court denied summary judgment on the fraudulent conveyance claim, determining there were genuine issues of fact regarding the existence of several "badges of fraud."

Two years later, however, the court granted summary judgment on that claim. The court assumed that Perkumpulan had a valid fraudulent conveyance claim and that the statute of limitations had not run; the determinative legal questions were whether Perkumpulan had the "creditor status" necessary to pursue the claims, or, if not, whether Perkumpulan could achieve creditor status before being time-barred. The court

---

[1] Civil RICO claims are brought under 18 U.S.C. §1964(c), a provision of the Racketeer Influenced and Corrupt Organizations Act.

reasoned that Perkumpulan probably did have creditor status when it filed the Alaska lawsuit, because the Washington suit was pending at the time. But once that case was dismissed, there was no judgment in Perkumpulan's favor and no pending litigation that "could conceivably yield a judgment against the transferors." The court rejected Perkumpulan's argument that it could use the Alaska litigation to achieve creditor status, concluding that Alaska had no personal jurisdiction over the Dressel scheme perpetrators and no subject matter jurisdiction over potential claims against them. The court entered final judgment in favor of PADRM and awarded it attorney's fees and costs totaling $66,090.50.

## B.    Collection Proceedings

PADRM sought without success to recover on its judgment. The superior court ordered Perkumpulan to submit to a judgment debtor examination under Alaska Civil Rule 69(b). The examination was held in March 2019; the court later described Perkumpulan's conduct during the examination as obstructionist, with the company's representative refusing to provide basic information about itself or contact information for its managers. The court allowed PADRM to follow up with written discovery requests. When Perkumpulan responded with "baseless" objections, the court granted PADRM's motion to compel. In October 2019 PADRM filed a motion for a writ of execution against the sole asset of Perkumpulan's it could identify — a potential legal malpractice claim against Perkumpulan's Alaska attorneys. The basis of the claim, PADRM asserted, was that the attorneys had been negligent in advising Perkumpulan to pursue a claim that was "fatally defective" due to the company's lack of creditor status.

In November 2019, while PADRM's motion for writ of execution was pending, Perkumpulan reached a settlement with Gazewood & Weiner and the other attorneys who had represented it in Alaska. Perkumpulan agreed to waive any claims

it might have against the attorneys in exchange for the attorneys' waiver of any claims they might have for unpaid fees. The attorneys did not admit any liability, but the settlement agreement set out in detail the history of the underlying litigation, including the pursuit and dismissal of the Washington case, the decision to bring suit in Alaska, fee negotiations between Perkumpulan and its lawyers, the summary judgment process, and PADRM's claims of legal malpractice. Perkumpulan submitted the settlement agreement to the court, arguing — in a supplemental opposition to PADRM's motion for a writ of execution — both that Alaska forbids the assignment of hypothetical legal malpractice claims and that the release meant that any such claims could no longer exist anyway.

## C.    Superior Court Decision On Writ Of Execution

The superior court denied PADRM's motion for a writ of execution, concluding that legal malpractice claims are not involuntarily assignable as a matter of law. The court started with the premise that under Alaska law choses in action, including the right to bring an action to recover money, are generally assignable. But it noted that whether this general rule of assignability extends to legal malpractice claims was unsettled in Alaska. The court cited a majority rule in other jurisdictions that such claims are not assignable as a matter of law, noting further that even those jurisdictions that do allow assignment disfavor assignment to a litigation adversary.

The court then recited a number of public policy reasons why an involuntary assignment should not be allowed. It noted first that "allowing a judgment creditor to wrest control of [a colorable claim of legal malpractice] against the wishes of the client is inimical to the personal nature of a legal malpractice claim." It observed that allowing involuntary assignment of such a claim would "undermine the confidentiality at the heart of the attorney-client relationship" because litigating the claim could require the use of protected information which the client had not agreed to divulge. The court noted that attorneys' duty of loyalty could be compromised if they knew that opposing

parties could look to either the client or the attorney to satisfy a judgment. The court was also concerned that "[a]llowing judgment creditors to pursue their opponent's attorneys by this mechanism could risk leading to never-ending vindictive litigation, which would strain the resources of the courts," especially in cases like this one where "[u]ndertones of animosity, zeal, and harassment have been present throughout."

The court ultimately concluded that these policy considerations required that Alaska follow the majority rule prohibiting involuntary assignment of legal malpractice claims, and it therefore denied PADRM's motion for issuance of a writ of execution. By the same order, however, the court notified the parties of its perception that Perkumpulan's attorneys had an unresolvable conflict of interest due to the alleged legal malpractice claim and would be ethically required to withdraw.

PADRM appeals. Perkumpulan is not participating in the appeal. Gazewood & Weiner appears as amicus curiae and asks us to affirm the superior court's judgment.

## III. DISCUSSION

The sole issue before us is whether Alaska law allows the involuntary assignment of legal malpractice claims — that is, assignment against the wishes of the targeted attorney's client. "We review questions of law de novo, using our independent judgment."[2] PADRM argues that the Alaska statutes favor the free assignability of legal malpractice claims, while Gazewood & Weiner contends that legal malpractice is a form of personal injury, a type of claim which is generally unassignable. We adopt neither position entirely. We do not decide whether legal malpractice claims are generally assignable or unassignable; rather, we restrict our decision to involuntary assignments, and we conclude that they are not allowed under Alaska law.

---

[2]     *Tesoro Corp. v. State, Dep't of Revenue*, 312 P.3d 830, 837 (Alaska 2013).

**A. Whether Legal Malpractice Claims May Be Involuntarily Assigned Presents A Novel Issue Of Alaska Law And Policy.**

Alaska Statute 01.10.060 defines "personal property" as including "things in action."[3] As we have recognized, this means that legal claims are personal property under state law.[4] Alaska Statute 09.35.070 states that "[a]ll goods, chattels, money, or other property, both real and personal, or an interest in the property of the judgment debtor not exempt by law, and all property and rights of property seized and held under attachment in the action are liable to execution." No statute exempts legal malpractice claims or any other chose in action from execution.[5] Acquisition of a chose in action by writ of execution amounts to an involuntary assignment.[6] We have recognized as a general rule that "a cause of action can be assigned if it survives" the death of the prospective plaintiff.[7] And the Alaska legislature has specified that all claims besides defamation survive.[8]

---

[3] AS 01.10.060(9).

[4] *McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 720 n.16 (Alaska 2013) ("[A] chose in action, such as [a] claim for personal injuries, is a form of property." (quoting *Bush v. Reid*, 516 P.2d 1215, 1219 (Alaska 1973))). "Thing in action" is synonymous with "chose in action." *Id.* at 720 n.15.

[5] *See* AS 09.38 (containing the Alaska Exemptions Act and not exempting legal malpractice claims or any other chose in action from execution).

[6] *See Bergen v. F/V St. Patrick*, 686 F. Supp. 786, 788 (D. Alaska 1988) (equating writ of execution with "compelled assignment").

[7] *Andersen v. Edwards*, 625 P.2d 282, 290 (Alaska 1981); *see also Croxton v. Crowley Mar. Corp.*, 758 P.2d 97, 98 (Alaska 1988).

[8] AS 09.55.570.

We have also recognized, however, that public policy may limit the free assignment of legal claims.[9] And we assume that the legislature drafts laws with these policy limitations in mind.[10] We are also mindful of the fact that the assignability of legal malpractice claims directly impacts the practice of law, an area of particular concern to this court.[11] In light of similar considerations, other jurisdictions have concluded that it would be anachronistic to resolve the issue of the assignability of legal malpractice claims by reference to hard and fast rules governing the disposition of other types of property.[12] "Assignment [of legal malpractice claims] should be permitted or prohibited based on the effect it will likely have on modern society, and the legal system in particular."[13]

---

[9] *See, e.g.*, *Mat-Su Reg'l Med. Ctr., LLC v. Burkhead*, 225 P.3d 1097, 1102-03 (Alaska 2010) (recognizing public policy basis for rule that personal injury claims are nonassignable).

[10] *Id.* (assuming that statutory scheme did not explicitly exclude assignment of personal injury claim because that remedy was already excluded by existing Alaska precedent).

[11] *See* Alaska Const. art. IV, § 15 (vesting power to govern practice of law in this court).

[12] *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 341 (Ind. 1991) ("Today, it seems anachronistic to resolve the issue of the assignability of a legal malpractice claim by deciding whether such a claim would survive the client's death . . . . As is sometimes the case with the common law, the rule has outlived the reason for its creation."), *abrogated on other grounds by Liggett v. Young*, 877 N.E.2d 178 (Ind. 2007).

[13] *Id.*; *see also Kommavongsa v. Haskell*, 67 P.3d 1068, 1072, 1072 n.2 (Wash. 2003) (noting that state survival statutes and survival rule suggested that legal malpractice claims could be assigned, but recognizing that public policy considerations may dictate a different result); *Wagener v. McDonald*, 509 N.W.2d 188, 190 (Minn. App. 1993) ("[This court] consider[s] issues of public policy rather than the statutory survival
(continued...)

For similar reasons we reject Gazewood & Weiner's argument that we should bar the assignment of legal malpractice claims by classifying them with personal injury claims, which we have long recognized as nonassignable.[14] "Rather than straining to fit the claim into a category it does not fit, the better approach is to resolve the question on public policy grounds."[15]

We have not directly faced this issue before. In *Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, a law firm argued that a loan receipt agreement between an insurance company and its insured constituted an impermissible assignment of a potential legal malpractice claim.[16] We did not decide whether the claim itself could

<hr>

[13] (...continued)
test to determine whether legal malpractice claims are assignable.").

[14] *Burkhead*, 225 P.3d at 1102-03 ("[A]lthough we have never expressly held that assignments of personal injury claims are invalid as a matter of public policy, we have long recognized 'a general rule of non-assignability of claims for personal injury' under Alaska law." (quoting *Croxton v. Crowley Mar. Corp.*, 758 P.2d 97, 99 (Alaska 1988))).

[15] *Wagener,* 509 N.W.2d at 190; *see also Can Do, Inc. Pension & Profit Sharing Plan & Successor Plans v. Manier, Herod, Hollabaugh & Smith*, 922 S.W.2d 865, 867 (Tenn. 1996) (stating that deciding issue by analogy to traditional categories of claims is "outdated" and "misplaced"). The few states that have relied on traditional categories of claims to decide assignability of legal malpractice claims have reached different results. *Compare Botma v. Huser*, 39 P.3d 538, 541 (Ariz. App. 2002), *and Revolutionary Concepts, Inc. v. Clements Walker PLLC*, 744 S.E.2d 130, 134 (N.C. App. 2013) (concluding that legal malpractice claims are form of personal tort and therefore nonassignable), *with Hedlund Mfg. Co. v. Weiser, Stapler & Spivak*, 539 A.2d 357, 359 (Pa. 1988) (concluding that legal malpractice claims are pecuniary and therefore assignable). We have characterized professional malpractice claims as a hybrid of tort and contract. *See Breck v. Moore*, 910 P.2d 599, 603 (Alaska 1996).

[16] 828 P.2d 745, 757 (Alaska 1992). Loan receipt agreements, as explained in *Bohna*, "originated as a mechanism for insurance companies to compensate their
(continued...)

be assigned, characterizing the issue as "the validity of the assignment of the *proceeds* of a legal malpractice claim," which we held was "a valid settlement device."[17]

In *Bergen v. F/V St. Patrick*, the federal district court for the District of Alaska determined that "the Alaska Supreme Court would permit involuntary transfer" of causes of action against an insurer and insurer-assigned counsel for bad faith failure to settle, and it allowed the "plaintiffs to seek a writ of execution from the Clerk."[18] But the court recited rules applicable to causes of action generally, an approach we now reject, and it relied primarily on cases involving the assignment of claims against an insurer, not distinguishing legal malpractice claims as perhaps subject to different policy considerations.[19]

Because this is a matter of important public policy, and because it is a matter of first impression, we turn to the implicated policy factors to resolve it.

## B. Sound Policy Weighs Against Allowing The Involuntary Assignment Of Legal Malpractice Claims.

A number of other states have addressed the assignability of legal

---

[16]     (...continued)
insured who had suffered injury or damage while preserving their rights against potentially liable third parties"; under such an agreement, "the insurer would loan the amount of the loss to the insured with the loan to be repaid out of any recovery against a third party." *Id.* at 755.

[17]     *Id.* at 758 (emphasis added).

[18]     686 F. Supp. 786, 788-89 (D. Alaska 1988).

[19]     *Id.* at 788. We have cited to *Bergen* twice before today but have not adopted its rule. *See McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 720 n.15 (Alaska 2013) (quoting *Bergen* for definition of "thing in action"); *Crawford v. Avila*, No. S-15192, 2015 WL 3477237, at *3 (Alaska May 27, 2015) (in unpublished memorandum opinion and judgment, citing *Bergen* as supporting construction company's attempt to levy on contract suit between real estate professional and client).

malpractice claims. A California Court of Appeal held in an early case, *Goodley v. Wank & Wank, Inc.*, that such assignments were barred by public policy.[20] The majority of states have followed the *Goodley* rule, concluding that legal malpractice claims are nonassignable as a matter of public policy.[21] A common core of policy concerns have driven this consensus, focusing on the effect of assignment on the attorney-client relationship and on the practice of law more broadly. These concerns include the following:

> (1) assignment divests the client of the decision to sue; (2) assignment imperils the sanctity of the attorney–client relationship; (3) assignment erodes the attorney–client privilege; (4) assignment compromises zealous advocacy and the duty of loyalty; (5) assignment degrades the legal profession and the public's confidence in the court system by sanctioning an abrupt and shameless shifting of positions; (6) assignment restricts access to legal services by the poor or indigent; and (7) assignment creates a commercial market for legal malpractice claims.[22]

We focus our analysis on the involuntary assignment of legal claims because that is what is at issue here; we do not need to decide whether the same concerns would govern a voluntary assignment, that is, one the client initiates or agrees to. Like a majority of other courts, and based on sound public policy, we conclude that legal malpractice claims may not be involuntarily assigned in Alaska.

---

[20]    133 Cal. Rptr. 83, 87-88 (Cal. App. 1976).

[21]    *See* RONALD E. MALLEN, 1 LEGAL MALPRACTICE § 7:25 (2021 ed.) (stating that most states have "found the policy considerations underlying the *Goodley* decision persuasive to preclude an assignment" and listing cases); 6 AM. JUR. 2d *Assignments* § 57 (2021).

[22]    *Gray v. Oliver*, 943 N.W.2d 617, 624 (Iowa 2020).

### 1. The attorney-client relationship

"The relationship between an attorney and a client is a fiduciary one by nature and 'is founded on the trust and confidence reposed by one person in the integrity and fidelity of another.' "[23] The relationship — and thus the lawyer's effectiveness on the client's behalf — may well be weakened by the threat that a third party can invade it based simply on an accusation of legal malpractice levied by the client's adversary in litigation. In the context of voluntary assignments, some courts have concluded that "[w]here the attorney has caused harm to his or her client, there is no relationship that remains to be protected."[24] But that rationale does not apply to involuntary assignments, when clients unwillingly lose the ability to decide for themselves whether the relationship should continue.

A number of courts have determined that "[g]iven the policy considerations . . . and the personal nature of the duty owed by an attorney to [the] client,"[25] "the decision to bring a legal malpractice action 'is one peculiarly vested in the client.' "[26] A client may be committed to the attorney-client relationship for any number of reasons not apparent to an outsider: personal rapport, trust and confidence built on shared experience, faith in the attorney's abilities in the long term regardless of a single

---

[23]     *Skipper v. ACE Prop. & Cas. Ins. Co.*, 775 S.E.2d 37, 38-39 (S.C. 2015) (quoting *Moore v. Moore*, 599 S.E.2d 467, 472 (S.C. App. 2004)); *see Kenneth P. Jacobus, P.C. v. Kalenka*, 464 P.3d 1231, 1238-39 (Alaska 2020) ("Attorneys owe both a fiduciary duty and a duty of loyalty to their clients, and a lawyer's efforts must be for the benefit of the client.").

[24]     *Hedlund Mfg. Co. v. Weiser, Stapler & Spivak*, 539 A.2d 357, 359 (Pa. 1988).

[25]     *Christison v. Jones*, 405 N.E.2d 8, 11 (Ill. App. 1980).

[26]     *Gray,* 943 N.W.2d at 624 (quoting *Alcman Servs. Corp. v. Bullock*, 925 F. Supp. 252, 258 (D.N.J. 1996); *Chaffee v. Smith*, 645 P.2d 966, 966 (Nev. 1982)).

breach of duty. But once the potential malpractice claim is involuntarily assigned to someone else, "[t]he client is relegated to observing from the sidelines as the assignee pursues the attorney."[27] Courts voicing these concerns have concluded that "the client, as the personal beneficiary of the duty owed by the attorney, should not be involuntarily divested of the decision as to whether to sue for a breach thereof, since such a rule would permit malpractice lawsuits without regard to (or even contrary to) the client's wishes."[28]

The facts of this case illustrate the salience of this concern. Perkumpulan never accused its attorneys of malpractice in the underlying proceedings. And it chose to waive any malpractice claim it may have had in exchange for settling its attorneys' claims for fees. It was PADRM, Perkumpulan's adversary in litigation, that accused Perkumpulan's attorneys of acting negligently on Perkumpulan's behalf. And it was because of these accusations that the superior court required Perkumpulan's attorneys to withdraw from the case due to the perceived conflict of interest, leaving Perkumpulan unrepresented. The potential availability of an involuntary assignment thus robbed the client not only of the decision whether to pursue a legal malpractice claim but also of its right to be represented by counsel of its choice.

Involuntary assignment also has a pernicious effect on the attorney-client privilege. A lawyer has a duty to keep the client's confidences unless the client gives informed consent to their disclosure.[29] But "the client may not sue for breach of the attorney's duties and also simultaneously prevent the attorney from defending himself

---

[27]     *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 343 (Ind. 1991), *abrogated on other grounds by Liggett v. Young*, 877 N.E.2d 178 (Ind. 2007).

[28]     *Gray*, 943 N.W.2d at 624 (quoting *Kracht v. Perrin, Gartland & Doyle*, 268 Cal. Rptr. 637, 640 n.5 (Cal. App. 1990)).

[29]     Alaska R. Prof. Conduct 1.6.

by invoking the privilege."[30]  A suit for legal malpractice thus puts discussions with counsel at issue, which out of fairness to the lawyer functionally waives the attorney-client privilege.[31]  This means that the lawyer may "reveal a client's confidence or secret to the extent the lawyer reasonably believes necessary . . . to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client."[32]

When the claim is assigned involuntarily to a third party, the client has taken no action that implicitly waives the duty of confidentiality.  "An involuntary assignment thus unfairly prejudices either the attorney (by precluding any defense based on privileged communications) or the client (by permitting the assignee to waive the privilege without the client's consent)."[33]  "Clients who might be sophisticated enough to foresee this possibility and elect to withhold damaging information from their attorneys would be no better served than less sophisticated clients who might be blind-sided by it; either result would erode the principles fostered by the duty of confidentiality."[34]

PADRM argues that the assignment of legal claims may actually improve the relationship between clients and their attorneys because the increased threat of a legal malpractice claim would encourage zealous and presumably negligence-free advocacy for the client's interests.  But attorneys already practice in the shadow of potential malpractice claims; our ethics rules, in fact, require attorneys to either maintain

---

[30]     *Gray*, 943 N.W.2d at 625 (quoting *Kracht*, 268 Cal. Rptr. at 641 n.6).

[31]     *See Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1280 (Alaska 2013).

[32]     Alaska R. Prof. Conduct 1.6(b)(5).

[33]     *Gray*, 943 N.W.2d at 625 (quoting *Kracht*, 268 Cal. Rptr. at 641 n.6).

[34]     *Kommavongsa v. Haskell*, 67 P.3d 1068, 1074 (Wash. 2003).

malpractice insurance in certain minimum amounts or inform new clients in writing that they do not.[35] We agree with the observation of the Indiana Supreme Court that "[r]ules which discourage an attorney from acting loyally and confidentially toward a client should not be erected without very good cause."[36] We are not convinced that the zealousness of an attorney's representation would be significantly bolstered by the added threat that a stranger to the relationship might acquire the client's right to sue the attorney for breaches of duty.

### 2.    Broader effects on the provision of legal services

We also conclude that allowing involuntary assignment of legal malpractice claims would have broader negative effects on the provision of legal services generally. First, attorneys may be less willing to provide legal services to indigent clients if potential legal malpractice claims come to be viewed as backstops to uncollectible judgments.[37] In Alaska, this effect would be compounded by Alaska Civil Rule 82, by which prevailing parties receive judgments for attorney's fees as a matter of course regardless of the good faith with which the action was pursued or defended.

Other courts have also voiced a concern with the commodification of claims:

> The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic

---

[35] Alaska R. Prof. Conduct 1.4(c).

[36] *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 343 (Ind. 1991), *abrogated on other grounds by Liggett v. Young*, 877 N.E.2d 178 (Ind. 2007).

[37] *See Gray*, 943 N.W.2d at 627 ("By agreeing to represent an insolvent defendant, a lawyer could be putting his own assets and insurance within reach of a plaintiff who otherwise would have an uncollectible judgment." (quoting *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 318 (Tex. App. 1994))).

bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights.[38]

PADRM suggests that this is the current trend: to "encourage markets in litigation as a means for access to justice." This may be true in the voluntary assignment context. Clients who have been injured by their attorneys' breaches of duty have the right to seek redress for their injuries. But when involuntary assignments are allowed, disinterested third parties will have the incentive to seek out and obtain the rights to legal malpractice claims that the client never chose to pursue, with the potential negative effects on the attorney-client relationship discussed above. We do not see how the commodification of claims in this way promotes access to justice. And because we have approved the assignment of the *proceeds* from legal malpractice claims,[39] existing law gives wronged clients a way to use their asset, should they wish to do so, to their financial advantage.

Lastly, involuntary assignment of a legal malpractice claim to the client's litigation adversary, as is sought here, may erode public confidence in the judicial system by "sanctioning an abrupt and shameless shifting of positions."[40] A legal malpractice case generally requires a "trial within a trial": to prove that the client's damage was proximately caused by legal malpractice, the client must show that the client's claim or defense would have been successful but for the attorney's breach of duty.[41] When the

---

[38] *Id.* (quoting *Goodley v. Wank & Wank, Inc.*, 133 Cal. Rptr. 83, 87 (Cal. App. 1976)).

[39] *See Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745, 757 (Alaska 1992).

[40] *Gray*, 943 N.W.2d at 626.

[41] RONALD E. MALLEN, 4 LEGAL MALPRACTICE § 37:1 (2021 ed.); *see Power*
(continued...)

client's adversary takes up the client's claim, the adversary must argue that it prevailed not because its position had more merit but rather because the client's attorney was negligent. A Texas court labeled this "a demeaning reversal of roles": "For the law to countenance this abrupt and shameless shift of positions would give prominence (and substance) to the image that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth."[42] The court continued:

> It is one thing for lawyers in our adversary system to represent clients with whom they personally disagree; it is something quite different for lawyers (and clients) to switch positions concerning the same incident simply because an assignment and the law of proximate cause have given them a financial interest in switching.[43]

We agree that this complication, while not itself determinative, adds to the policy arguments against allowing involuntary assignments.[44]

In sum, we are persuaded by the policy implications and the weight of relevant authority that the involuntary assignment of legal malpractice cases is contrary to Alaska law. We therefore affirm the superior court's omnibus decision and order

---

[41]    (...continued)
*Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 30-31 (Alaska 1998) (approving superior court's use of "trial-within-a-trial approach" for legal malpractice case).

[42]    *Zuniga*, 878 S.W.2d at 318.

[43]    *Id*.

[44]    PADRM argues that this policy concern is irrelevant here because its position in the underlying litigation was that the claims were without merit due to Perkumpulan's lack of creditor status, and it is not inconsistent to argue that Perkumpulan's attorneys negligently failed to recognize this fact. But the policy concern may well be present in other cases and therefore militates against adoption of the assignability rule PADRM advocates.

denying PADRM's motion for a writ of execution on Perkumpulan's potential legal malpractice claim against its Alaska attorneys.[45]

## IV.   CONCLUSION

We AFFIRM the decision of the superior court.

---

**45**      Because we decide that a potential legal malpractice claim may not be involuntarily assigned, we do not need to decide whether the settlement between Perkumpulan and its attorneys extinguished the claim such that in this case there was nothing to assign. *See, e.g.*, *Van Voris v. Team Chop Shop, LLC*, 402 S.W.3d 915, 918 (Tex. App. 2013) ("A release operates to extinguish a claim or cause of action and is an absolute bar to the released matter.").